UNITED STATES of America

v.

**William JOHNSON, Defendant.**

**No. 72 CR 921.**

United States District Court,
E. D. New York.

March 11, 1975.

---

David G. Trager, U. S. Atty., Brooklyn, N. Y., by Thomas R. Pattison, Asst. U. S. Atty., for plaintiff.

Allen Lashley, Brooklyn, N. Y., for defendant.

## MEMORANDUM OF DECISION

NEAHER, District Judge.

The defendant, William Johnson, having waived trial by jury, was tried by the court on an indictment charging him alone with bank robbery in two counts. 18 U.S.C. §§ 2113(a) and (d) and § 2.[1] It was stipulated as fact at the outset, in lieu of witnesses to be called by the government, that on February 29, 1972, the Kings Lafayette Bank, 650 Fulton Street, Brooklyn, New York, was robbed of approximately $89,000 by five armed males, the bank's deposits being then insured by the Federal Deposit Insurance Corporation. It was also stipulated that there were no eyewitness identifications of the defendant as one of the bank robbers. The crucial question to be determined at trial was whether defendant had confessed his participation in the robbery beyond a reasonable doubt by voluntary statements made to the officers who had arrested him.

The government's evidence, aside from the stipulation of facts, consisted solely of the testimony of the arresting officers and certain documents and photographs bearing defendant's signature

---

1. A third count charged Johnson with conspiracy to rob the bank, 18 U.S.C. § 371, but since the waiver of jury trial expressly extends only to the specified substantive counts, the conspiracy charge is deemed to have been abandoned by the government.

and other writing by him.[2] In summary, that evidence, if fully credited, established the following facts:

On April 24, 1972, prior to 2:00 p. m., F.B.I. Special Agent Joseph Koletar, accompanied by New York City Detectives Richard Hodgson and Robert Killie, went to defendant's apartment at 898 Saratoga Avenue in Brooklyn to place him under arrest. In response to their knock, defendant opened the door and, after the officers identified themselves, indicated he was expecting them. After being informed of his rights, defendant accompanied the officers to the 76th police precinct. There he was again advised of his rights and stated his willingness to talk to Agent Koletar about the Kings Lafayette Bank robbery, although declining to sign the waiver of rights included in a standard F.B.I. "Interrogation: Advice of Rights" form presented to him. Then for one and a half to two hours he gave a detailed narration of the bank robbery.

With defendant's agreement, his verbal statement was reduced to written form by Agent Koletar and signed by defendant, at which time he also agreed to sign the "Interrogation: Advice of Rights" form and did so. In that statement dated "4/24/72," time "4:40 P.M.," Government's Exh. 3, the defendant admitted:

"I helped rob the Kings Lafayette Bank, 650 Fulton Street, Brooklyn, New York on February 29, 1972. My job in the robbery was to stand guard over bank employees at the front of the bank. During the robbery I held my hand in my pocket as if I had a gun. A money shipment in a canvas bag was taken from the bank.

"Later the same day, I received about $12,000.00 in United States currency for my part in the robbery, this money having come from the bank."

Although the entire statement was in Agent Koletar's handwriting, it concluded with a statement and signature admittedly in defendant's handwriting, which read:

"I have read this statement, consisting of this and one other page, which I have initialed, and it is true and correct."

The four succeeding pages of Government's Exh. 3, also in Koletar's handwriting, recite the details of the planning and execution of the bank robbery, the names of the other participants, their activities in the bank, and the manner of the getaway and distribution of the loot. Identified by defendant as other participants in the robbery were Mervin Cecil Barry, Edward Davis, Jeffrey Patrick Bonner, Randy Russell and Earl Rozier, who remained outside as lookout with the then unidentified driver of the getaway car.[3] This portion of the statement was also concluded by a

2. A pre-trial evidentiary hearing had been held on defendant's motion to suppress these documents and photographs. That motion was determined by a separate memorandum and order filed in the case on December 5, 1973. All documents and photographs herein referred to were held admissible at trial. Contemporaneously, the court denied defendant's motion to dismiss the indictment for failure to afford him a speedy trial. See separate Memorandum and Order filed on November 23, 1973.

3. The accuracy of defendant's knowledge of the bank robbery in question within two months of its occurrence is confirmed by the subsequent pleas of guilty to separate indictments of each of the named participants except Davis. Davis, according to Agent Koletar, was arrested in California and gave a statement implicating himself in the crime but was never prosecuted because after psychiatric examination he was committed to the Matteawan State Hospital for the criminally insane while awaiting trial on a New York State homicide charge. The other participants are currently serving prison sentences imposed by this court. The defendant also subsequently identified the driver of the getaway car, one Samuel McDuffie, although the court suppressed the statement given by defendant as beyond the scope of his counsel's previous consent to contacts with the arresting officers without counsel being present. McDuffie pleaded not guilty to a separate indictment charging him with participation in the bank robbery, went to trial and was convicted by a jury on all counts. His conviction was affirmed by the Court of Appeals and he is presently serving the sentence imposed by this court.

sentence in defendant's clearly written handwriting, acknowledging that it was "true and correct," followed by his signature.

During the interview at about 3:00 p. m., defendant was permitted to and did make a telephone call. Throughout the interview defendant was cooperative, was able to read and write, spoke without slurred speech and exhibited no needle marks or other evidence of recent drug intake. At no time was he threatened or coerced. At the conclusion of the interview about 6:00 p. m., he was taken by the arresting officers to F.B.I. headquarters in Manhattan where he went through the usual processing, after which he was lodged at the Federal Detention Center.

On the next morning, April 25, 1972, defendant was arraigned before a United States Magistrate who assigned Joel Winograd, Esq., to represent him. In defendant's presence, Agent Koletar at that time informed Winograd of the defendant's cooperation of the day before and obtained Winograd's consent to the officers' seeing defendant "in the future" for the purpose of showing him photographs to further identify members of the bank robbery group.

On May 1, 1972, pursuant to the foregoing arrangement, Agent Koletar and Detective Hodgson met with defendant in the detention room in this courthouse. On that occasion, in the absence of his counsel, defendant signed an "Interrogation: Advice of Rights" form including a waiver of rights. Government's Exh. 4. He was shown a group of six photographs from which he selected one, placing his signature and the date "1 May 1972" on the back. Government's Exh. 5. Defendant did not know the man's name but identified him as being present in the Davis apartment when the bank loot was split up. After being informed that the man was Virgil Lee Woods, defendant signed a statement admitting that Woods had observed defendant receiving his share and that he gave Woods several hundred dollars from that share when Woods asked for it. Government's Exh. 8.

Two days later, on May 3, 1972, defendant was taken by Agent Koletar and Detective Hodgson to the Bureau of Criminal Identification of the New York City Police Department for the purpose of attempting to identify the driver of the getaway car. After examining numerous photographs defendant was unable to make a definite identification. On that occasion he was also shown a group of six photographs of females and identified a woman whom he had seen with Davis and Bonner shortly after the robbery, although he did not know her name. After being informed by Agent Koletar that she was Trudy Regester, the sister of Edward Davis' wife, defendant, in the absence of counsel, signed a statement prepared by Agent Koletar identifying her as a woman who had conversed with two of the bank robbers, Bonner and Barry, in the Davis apartment during the distribution of the money from the bank. In addition to his signature, the statement bore a sentence in his own handwriting acknowledging it to be "true and correct." He also placed his name and the date "3 May–72" on the back of the photograph. Government's Exhs. 7 and 8.

Following the denial of a motion for acquittal based upon the asserted insufficiency of the government's evidence, defendant, who has no prior criminal record, testified in his own defense. He is a Sergeant E–5 in the United States Army, having enlisted at age 18 after completing high school some fourteen years ago. He has been decorated for extended combat service and wounds received in Vietnam and Cambodia. During service he completed two years of college level studies equivalent to an associate degree in liberal arts. He also acquired a drug habit in Vietnam in 1965 and was eventually returned to the United States. He is presently stationed at Fort Dix, New Jersey, pending the outcome of this criminal case.

Although he admitted signing his name, placing his initials and writing

the statements that he had read the contents of Government's Exhs. 3, 4, 6 and 8, he flatly denied any participation in the Kings Lafayette Bank robbery.

According to defenant's direct testimony, the two city detectives came to his apartment about 11:00 a. m. on April 24, 1972, when he was "shooting some heroin" with three other companions. He was told to get dressed, was not informed of any rights and did not meet Agent Koletar until taken downstairs to the automobile in which Koletar was seated with a drug informant whom defendant recognized.

At the 76th precinct, he testified, it was the officers who knew all the details about the bank robbery and did all the talking, merely asking him whether he knew this or that individual. Later, when Agent Koletar had completed writing, he was asked to sign certain papers, which he obediently did without reading them. Although he had asked to call his wife, who was at work, he was not permitted to do so until 5:25 p. m., when it was too late to get her at the office. He was then taken to F.B.I. headquarters, where he remained until he was finally brought to the Federal Detention Center at about 9:00 p. m. There he obtained a "tab" of methadone from a fellow inmate. He did not receive methadone from the prison authorities until the next morning, just before he was brought over to the United States Magistrate's court.

At the Magistrate's proceedings, he testified a man came up and introduced himself as Mr. Winograd, saying he was there to represent him. Defendant had noticed this man previously speaking to Agent Koletar and the police officers. Winograd told defendant that he had been informed of his cooperation and said defendant should continue to cooperate with the officers and everything would be all right; that they would take care of getting him drug treatment. Defendant testified he told Winograd "You're really taking me for an idiot" and told him he didn't want Winograd to talk to him again.

However, on two subsequent occasions when defendant was shown photographs by the officers, he selected pictures of people he recognized and signed his name on the back. Government's Exhs. 5 and 7. He recalled also another occasion when Agent Koletar brought some federal narcotics agents to see him. They wanted him to work for them, "to go out into the street and secure information about who's selling and trafficking in narcotics." He told them "they're out of their mind." Nevertheless, they gave him a card "should I change my mind."

On cross-examination, he enlarged upon his direct admissions to knowing Edward Davis—the apparent leader of the bank robbers—and having been asked by Davis in the middle of January 1972 whether he wanted to take part in the bank robbery. Defendant says he told Davis "he was crazy." Nevertheless, he was later approached again by Mervin Barry—one of the bank robbers—and went with Barry to Davis' apartment, which was just around the corner from where defendant lived. There were others present and more talk about the proposed robbery and the need to get guns, but defendant just "laughed" about it all.

He was also queried about his direct testimony concerning the interview with the federal drug agents he had mentioned, but denied he had acted as a drug runner for an individual named Richie Garbellotto or had told Agent Koletar that he had used his share of the proceeds of the bank robbery to pay off Garbellotto.

Agent Koletar was recalled as the government's rebuttal witness. He testified that on May 26, 1972—a month after defendant's arrest—he interviewed defendant concerning narcotics traffic information defendant told him he had. On the basis of that interview Koletar had prepared a detailed three-page memoran-

dum dated May 30, 1972, addressed to the F.B.I.'s Special Agent in Charge for referral to the Bureau of Narcotics and Dangerous Drugs and to the Criminal Investigation Division of the United States Army.

According to Koletar, defendant identified Garbellotto as an acquaintance for whom defendant had acted as a courier in delivering narcotics. On one occasion, however, defendant got rid of a package of narcotics because he believed he was being set up. Garbellotto demanded payment or production of the package. Defendant told Koletar he had used part of the $12,000 proceeds from the Kings Lafayette Bank robbery to pay off Garbellotto.

The government marked the May 26, 1972 memorandum for identification (Government's Exh. 11) and turned it over to defense counsel for use in cross-examining Koletar on his rebuttal testimony. That cross-examination developed that the memorandum was not prepared for use in the case but only for intelligence value and that Koletar was unfamiliar with the use made of it thereafter. Because of defense objections, the memorandum was subsequently marked Court Exh. 1 for consideration by the court in passing on those objections and ruling on the defendant's renewed motion for acquittal.

■ ■ Defendant asks that "a judgment of not guilty be entered in the interests of justice", contending that the trial produced no evidence through eyewitnesses, photographs or any witnesses whatsoever that the defendant was at the Kings Lafayette Bank or participated in the robbery. Such evidence is wholly unnecessary, however, when, as here, it is shown by stipulated facts that a crime has been committed. No further corroboration of the defendant's confession is required. See Opper v. United States, 348 U.S. 84, 93, 75 S.Ct. 158, 99 L.Ed. 101 (1954); United States v. Braverman, 376 F.2d 249, 253 (2 Cir. 1967). Here, the court had already denied defendant's motion to suppress the

written statement confessing to his involvement in the bank robbery (Government's Exh. 3) n. 2 *supra*. It was, of course, open to the defendant to renew at trial his challenge to the voluntariness of the confession or its lack of factual veracity. Indeed, he had no other choice, for without contradicting evidence, the court would have been constrained in the circumstances to accept the confession as the best evidence of guilt beyond a reasonable doubt.

■ Defendant chose to challenge the credibility of his confession by substantially repeating testimony he had given at the prior suppression hearing concerning the circumstances of his arrest, the interview at the 76th precinct and subsequent contacts with Agent Koletar and the detectives, all designed to show that he had acted without understanding and under coercive influences. He thereby placed his own credibility in issue and exposed himself to the damaging revelation, noted above, made to Agent Koletar a month after his arrest and while he was purporting to cooperate in furnishing information about narcotics trafficking. Defendant opened the door to that testimony by his own statements on direct concerning his being interviewed by agents from the Bureau of Narcotics and his later denial on cross-examination that he had anything to do with Richie Garbellotto.

Recognizing the damaging effect of the government's rebuttal evidence and its written embodiment (Court Exh. 1), defendant has made the exhibit the focal point of a four-pronged attack. He argues (1) that he did not open the door to the receipt of his later statement to Koletar as testified to on rebuttal; (2) that the government had withheld disclosure of this recorded statement of defendant despite a prior motion under Rule 16 which had requested all such statements in the possession of the government; (3) that Court Exh. 1 was a report by Agent Koletar which contained information about the case and should have been turned over as § 3500 materi-

al after Agent Koletar's direct examination had been completed; and (4) such evidence should in no event have been admitted because of the court's prior ruling suppressing all statements by defendant taken from him after May 3, 1972, and particularly a separate statement he signed dated May 26, 1972, relating to another group of photographs of suspected participants in the bank robbery.

As already indicated, contention (1) is without merit. His direct testimony concerning an interview with federal narcotics agents and Koletar concerning the information set forth in Court Exh. 1 clearly opened the door for government counsel to ask him questions about his knowledge of Richie Garbellotto and drug dealings with him, as bearing upon the credibility of his denial of participation in the bank robbery to which he had confessed.

Defendant's contentions (2) and (3) above raise a more serious question with their suggestion that the government seriously breached its obligation to furnish defense counsel prior to trial with all statements made by defendant the government knew to exist. The government argues that Court Exh. 1 is merely an internal memorandum having no relation to this case; and further, that it had no intention of using such a memorandum at trial and therefore held nothing back it expected to use. Moreover, the government points out, defendant can hardly claim complete surprise since he testified at the suppression hearing and referred to Agent Koletar's taking notes as to his narcotics dealings.[4]

United States v. Padrone, 406 F.2d 560 (2 Cir. 1969), on which defendant mainly relies, held it was reversible error for the government not to furnish a copy of a statement made by defendant as required by a court order. Although the government's failure in that case was inadvertent, the court regarded it as "so serious a detriment to the prepara-

tion for trial and the defense of serious criminal charges" as to warrant a new trial "where it is apparent . . . that . . . defense strategy may have been determined by the failure to comply . . . " *Id.* at 561.

Here the government cannot claim inadvertence. It made a deliberate decision to withhold Court Exh. 1, even though in the good faith belief that this was required by the court's earlier order suppressing any statements made after May 3, 1972. The difficulty with the government's contention is that an order prohibiting the government from *using* statements at a trial does not relieve the government of its obligation to make *all* statements of the defendant available to the defense prior to trial. As was recently pointed out in United States v. Percevault, 490 F.2d 126 (2 Cir. 1974), "[c]ommon sense and judicial experience teach that a defendant's prior statement in the possession of the government may be the single most crucial factor in the defendant's preparation for trial."

Defense counsel here asserts— and the court has no reason to doubt him —that the use of the statement in Court Exh. 1 on rebuttal came as a complete surprise. He points out that he had no knowledge of it until government counsel turned it over for his use on the rebuttal cross-examination. Defense counsel understandably views the memorandum as "highly prejudicial" and states that it could well have affected defense strategy as to whether or not defendant should have taken the stand, or even if he did, whether narcotics should have been mentioned on the direct examination. It is essentially for these reasons that defendant urges the court to direct an acquittal "in the interests of justice."

The court in *Padrone, supra,* did not go that far; nor did it do so in United States v. Baum, 482 F.2d 1325 (2 Cir. 1973), where it severely criticized a government prosecutor for unjustifiably withholding disclosure of the identity of a prospective witness whose testimony

---

4. See transcript of suppression hearing, May 10, 1973, p. 181.

was as equally crucial to the defense as it was to the government. In each case a new trial was directed because of the apparent prejudice to the defense.

Here, prejudice is claimed but not demonstrated. Must a new trial be granted simply because of the prosecutor's error? United States v. Crisona, 416 F.2d 107 (2 Cir. 1969), would seem to support a negative response. There, although holding that a defendant's pre-arrest statements made on tapes were "statements" under Rule 16(a), F.R. Crim.P., that should have been disclosed to the defense, the court denied a new trial because the "failure to make them available was not in fact harmful." *Id.* at 115.

In this case, the defendant had no option not to testify. He was virtually compelled to take the stand to overcome the convincing force of a prior written statement, confessing his part in the robbery, the truth and correctness of which he had acknowledged in his own handwriting. Government's Exh. 3. He also admitted writing the "true and correct" statement and signing his name to the other statements and photographic exhibits in evidence. His attempt to dispel the force of these admissions by giving his version of the arrest and interviews added nothing to his prior testimony at the suppression hearing.

At the hearing and again at trial, the court found defendant to be an intelligent, shrewd, forceful and articulate man, whose lengthy Army career and combat service was wholly inconsistent with his effort to portray himself as beclouded by narcotics and submissive to the overpowering influence of Agent Koletar and the two detectives. His own account of his observations and actions the next morning at the Magistrate's proceedings served only to complete the picture of a man completely in control of his faculties who fully understood what was going on.

However questionable the government's conduct in not disclosing Court Exh. 1 until rebuttal, testimony of defendant's oral statements to Agent Koletar a month after his arrest, which were consistent with his admission of guilt on the day of his arrest, is clearly admissible on the issue of credibility. Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); United States v. Gaynor, 472 F.2d 899, (2 Cir. 1973).

 For the foregoing reasons, the court is satisfied beyond a reasonable doubt that defendant's confession, Government's Exh. 3, was voluntarily made after he had been informed of his constitutional rights and that it truly reflects his guilt beyond a reasonable doubt of the charges set forth in Counts One and Two[5] of the indictment.

The defendant is found guilty on Count One and Count Two of the indictment. Count Three is dismissed.

---

5. Although defendant's confession shows that he was unarmed, his other statements make it clear that he knew others he identified as robbers were armed with handguns. Defendant is therefore guilty as a principal as charged in Count Two.