**UNITED STATES of America,**
**Appellee,**

v.

**William JOHNSON,**
**Defendant-Appellant.**

**No. 132, Docket 75–1196.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 4, 1975.

Decided Oct. 30, 1975.

Certiorari Denied Feb. 23, 1976.
See 96 S.Ct. 1127.

---

Allen Lashley, Brooklyn, N. Y., for defendant-appellant.

Victor J. Rocco, Asst. U. S. Atty., E. D. N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., of counsel), for appellee.

Before KAUFMAN, Chief Judge, and MULLIGAN and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

Appellant William Johnson was convicted of bank robbery in violation of 18 U.S.C. § 2113 after a trial to the court (Neaher, *District Judge*) in the Eastern District of New York. He was given a five-year suspended sentence and placed on probation for five years on special conditions. *United States v. Johnson,* 390 F.Supp. 1049 (E.D.N.Y.1975). He appeals on two grounds: (1) that the failure of the government to furnish him with an FBI memorandum of his own statement of May 26, 1972 to Agent Joseph Koletar, pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3500, so impaired the defense in the presentation of its case as to have deprived him of his right to a fair trial; and (2) that the government's

purported failure to communicate its readiness for trial for a period longer than six months from the date of appellant's arrest violated the then effective Second Circuit Rules Regarding Prompt Disposition of Criminal Cases and required a dismissal of the indictment. We affirm.

On April 24, 1972, William Johnson was arrested by local and federal authorities in connection with the February 29, 1972 robbery of the Kings Lafayette Bank, 650 Fulton Street, Brooklyn, New York. After being advised of his rights, appellant agreed to accompany the arresting officers to the 76th Precinct in Brooklyn for questioning. There Johnson was advised of his rights for a second time and again agreed to be questioned in connection with the robbery. Johnson voluntarily gave a detailed narration describing his involvement in the crime and the events leading up to and surrounding the robbery. These admissions, with appellant's consent, were reduced to a two-part written statement and signed by appellant. The statement written down by FBI Special Agent Koletar included the names of most of the other participants and their respective roles, the mode of escape and, finally, the distribution of the loot.[1]

On the following morning, April 25, 1972, Johnson was arraigned before the United States Magistrate who assigned counsel and set bail. After the arraignment Agent Koletar and the Assistant United States Attorney assigned to the matter advised counsel of Johnson's cooperation and secured his consent to future interviews without counsel present, in the hope that further identifications would be made.

On May 1, under that arrangement, Agent Koletar and a detective of the

---

1. In the statement of April 24, 1972 the appellant admitted:

 "I helped rob the Kings Lafayette Bank, 650 Fulton Street, Brooklyn, New York, on February 29, 1972. My job in the robbery was to stand guard over bank employees at the front of the bank. During the robbery I held my hand in my pocket as if I had a gun. A money shipment in a canvas bag was taken from the bank.

 "Later the same day, I received about $12,000.00 in United States currency for my part in the robbery, this money having come from the bank."

New York City Police Department interviewed appellant in Brooklyn without presence of his counsel. After signing an FBI waiver of rights form, appellant identified Virgil Lee Woods from an array of photographs as present when the bank loot was distributed among the participants. Appellant signed and dated the photograph of Woods as well as an accompanying statement that Woods had been present when the appellant received his own share of the proceeds.

On May 3, 1972, two days later, Johnson was escorted, pursuant to court order, by the three arresting officers to the Bureau of Criminal Identification of the New York City Police Department to review mug shots on file in an effort to determine the identity of the driver of the getaway car. Though unable to identify any of the participants from the mug shots, appellant did identify, from a photographic array, the photograph of Gertrude "Trudy" Register as the unidentified woman referred to in the April 24 statement, who was present when the proceeds of the robbery were distributed among the participants.

In his April 24 statement appellant implicated Mervyn Barry, Jeffrey Bonner, Earl Rozier and Randolph Randy Russell as participants in the bank robbery. Each has since pleaded guilty to lesser counts (bank larceny and/or conspiracy) in connection with that robbery. Edward Davis, also identified by Johnson as a participant with himself, has been certified as incompetent. Virgil Lee Woods was arrested after Johnson's identification of his photograph and admitted a limited involvement in the robbery. He was not prosecuted.

On May 26, 1972, Agent Koletar met with Johnson again in the Marshal's office at the federal courthouse in Brooklyn to probe further into an apparently unrelated matter—appellant's admitted narcotics trafficking at Fort Riley, Kansas, where he had been stationed as a sergeant. Though Johnson later testified at the trial that he had balked at the prospect of undercover drug work or

testifying on behalf of the government, he identified his heroin contacts at Fort Riley and in Brooklyn, including one Richard Garbelotto, and described the circumstances of his own involvement in the drug traffic as a runner. During one of his "runs" in October, 1971, appellant, fearful that he had been "set up," disposed of a package of heroin with a street value approximating $16,000. Unable to account for the heroin or its proceeds, Johnson and his wife were subjected to threats of physical violence.

At this May 26 interview, Johnson admitted to Agent Koletar, who took notes throughout the interview, that he had used a large part of his share of the $12,000 he had received from the proceeds of the robbery to buy these people off. This information was reduced to writing four days later and incorporated, under date of May 30, into an FBI intelligence memorandum concerning narcotics matters to the Special Agent in Charge, New York, recommending that the information be forwarded to appropriate federal and local agencies, including the Criminal Investigation Division, United States Army, Fort Riley, Kansas.

I

Appellant moved for discovery and inspection, and the government consented to provide appellant with all written or recorded statements or confessions made by the defendant, pursuant to Rule 16(a). The government turned over all his statements except the report of May 30, 1972 by Agent Koletar, which was a summary of the oral statement relating to narcotics traffic given by appellant on May 26, 1972.

Appellant then moved to suppress the statements which had been furnished to him on the ground that they had been taken in the absence of an attorney. He did not move to suppress the May 30 report as such, for it had not been given to him and he had not been told of its existence. Judge Neaher conducted a suppression hearing and denied the motion to suppress the statements of appel-

lant made on April 24 on the ground that appellant had been given the *Miranda* warnings and understood them.[2] He refused to suppress the statements of May 1 and May 3 on the ground that the defendant and his counsel had explicitly and voluntarily waived any rights with respect to these interviews. The judge found, however, that there had not been an explicit waiver of rights regarding the meeting of May 26, and he suppressed the statement in which on that day appellant had made an identification of one McDuffie. Judge Neaher did not specifically suppress the May 30 report of Agent Koletar, however, because neither the court nor the appellant knew anything about it. The opinion simply stated that the court "grants defendant's motion as to the May 26 interview." The language used was broad enough to include the statements attributed to appellant in the May 30 memorandum.

The government, though it knew about the May 30 memorandum, deliberately withheld it, possibly because it believed that any statement resulting from the May 26 meeting with Agent Koletar had already been suppressed. As a matter of fact, the government did not use the FBI report of May 30 on its direct case.

At the trial it was stipulated that there had been a robbery at the Kings Lafayette Bank, a federally insured depository, on February 29, 1972, by five armed men at which $89,000 was stolen.

The appellant took the stand in his own defense. He conceded that he had signed the statements of April 24, May 1 and May 3, but maintained that he had not read them, denied participation in the bank robbery, and intimated that he had been under the influence of narcotics when he made the first statement. On cross-examination, appellant disavowed his May 26 identification of a

photograph of McDuffie which he had identified as the photograph of the driver of the getaway car. The prosecutor, probing Johnson's credibility, inquired about appellant's use of narcotics and his previous involvement in narcotics traffic with Garbelotto. Johnson denied making a statement to Agent Koletar on May 26, the same day he had identified McDuffie's photograph, to the effect that he had used his share of the proceeds of the robbery, $12,000, to pay off Garbelotto for drug debts. The defense rested and the government called Agent Koletar in rebuttal to testify that the defendant had admitted to him in the May 26 interview that he had used part of his $12,000 share of the proceeds of the bank robbery to pay Garbelotto. He thus gave the direct lie to appellant. The defense objected upon the ground that all conversations after May 5 had been suppressed. That appellant had admitted receiving $12,000 as his share of the bank robbery was already established in the earlier statements in evidence. See note 1. The only new matter was the admission that he had been a narcotics runner.

■ Appellant now contends that the oral statement he made to Agent Koletar on May 26, later reduced to writing in a report by the agent dated May 30, was his "statement" and should have been produced by the government pursuant to his motion for discovery and inspection under Rule 16(a). He maintains further that it should have been given to him, pursuant to 18 U.S.C. § 3500, after Agent Koletar's direct examination in the government's case rather than after his direct examination in the rebuttal case.

This court has never decided whether the written summary of an oral statement made by a defendant to a government agent is discoverable under Fed.R. Crim.P. 16(a), adopted in 1966.[3] Several

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

3. Amended Rule 16(a) takes effect on December 1, 1975. It provides in part that upon

request of a defendant the government shall permit the defendant to inspect and copy or photograph "the substance of any oral statement which the government intends to offer in evidence at the trial made by the defendant

circuits have held such a summary not to be a "written or recorded statement made by the defendant" subject to discovery. *United States v. Krilich,* 470 F.2d 341, 351 (7 Cir. 1972), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1897, 36 L.Ed.2d 399 (1973); *United States v. Fioravanti,* 412 F.2d 407, 411–12 n. 12 (3 Cir.), *cert. denied,* 396 U.S. 837, 90 S.Ct. 97, 24 L.Ed.2d 88 (1969); *United States v. Battaglia,* 410 F.2d 279, 283 (7 Cir.), *cert. denied,* 396 U.S. 848, 90 S.Ct. 73, 24 L.Ed.2d 97 (1969); see *Kaplan v. United States,* 375 F.2d 895, 900 (9 Cir.), *cert. denied,* 389 U.S. 839, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967). See also *Walsh v. United States,* 371 F.2d 436 (1 Cir. 1967). The District of Columbia and the Eighth Circuits, on the other hand, have refused to distinguish between verbatim statements and summaries of conversations memorialized after the fact and have held that both are discoverable within the discretion of the trial judge. *United States v. Lewis,* 511 F.2d 798 (D.C.Cir. 1975) (Lumbard, *J.*); *United States v. Fallen,* 498 F.2d 172 (8 Cir. 1974). We would follow the latter view and hold the written summary discoverable in the court's discretion, which could not be exercised here because the government failed to disclose the May 30 memorandum to Judge Neaher.

■ Appellant maintains that if we rule the written summary of the oral statement made by the defendant on May 26 to be a "statement" we must reverse the judgment of conviction because the use of the "statement" by the prosecution was prejudicial, was a complete surprise to the defense and "could have affected the appellant's defense strategy as to whether or not he should have taken the stand." We do not agree. We find that the use of the "statement" on cross-examination and on rebuttal was not prejudicial.

Appellant relies strongly on *United States v. Padrone,* 406 F.2d 560 (2 Cir. 1969), in his argument for reversal. In *Padrone* the District Court had ordered the government to produce a specific statement taken from the defendant by an Assistant United States Attorney, which it failed to do. The defendant took the stand and was then cross-examined from the very statement withheld by the government. We decided that it was "apparent" that the defense strategy might have been affected by the failure of the prosecution to comply with the court order, and we granted a new trial.[4]

Johnson had given three separate statements admitting his participation in the robbery before he made his additional admission on May 26. He faced only a theoretical choice of not taking the stand and leaving these statements, which had already been held admissible after the *Miranda* hearing, unexplained as admissions of guilt, or taking the stand and brazening it out.

When he took the stand the defendant testified that he told the agents details of the robbery that he had heard at a planning meeting but which he had never participated in carrying out. He swore that he had not read the statements which he signed, and that he had merely signed and initialed where he was told to do so. He explained away the portion in his own handwriting which acknowledged that he had read the statement on the ground that "it was dictated to me."

In the statement of April 24, 1972 appellant had named five people as fellow participants in the bank robbery and all

whether before or after arrest in response to an interrogation by any person then known to the defendant to be a government agent."

**4.** Appellant also cites *United States v. Baum,* 482 F.2d 1325 (2 Cir. 1973). There we ordered a new trial because of the government's failure

to identify in advance a key witness who testified to a prior similar offense. There we noted that it was a "close" case and that there was no reason for the non-disclosure, which was attributed to a lack of candor unworthy of a prosecutor. 482 F.2d at 1332.

of these who were mentally competent had pleaded guilty.[5] Such practical corroboration of a confession is a prosecutor's dream.[6]

■ Faced with this situation and with his confessions on three separate occasions, it is beyond any likelihood that appellant could have rested on the government's case and hoped for an acquittal. If he had, indeed, known that his May 26 admission had been reduced to writing, that could not reasonably have affected his decision to take the stand. On his own earlier admissions his goose was cooked unless he did.[7] And, significantly, it was the same agent, Koletar, who testified to each of the confessions. This was not even a case of adding another witness to bolster the credibility of the main witness.

■ We think the government should be more careful in complying strictly with orders to produce a defendant's statements, as it concedes. Discovery of defendant's statements within the Rules must not be restricted in niggardly fashion. *See United States v. Lewis,* 511 F.2d 798 (D.C.Cir. 1975). When in doubt the prosecutor should seek a ruling from the court on whether a particular paper is discoverable. But while we do not hesitate to impose sanctions on the government as we did in *Padrone, supra,* this case is so free of prejudicial effect from the failure to disclose the May 30 memorandum that it would be a travesty to suggest that the defendant might have refrained from taking the stand and still have been acquitted. See *United States v. Williams,* 523 F.2d 407, 410 n. 2 (2 Cir. 1975), collecting cases holding constitutional errors "harmless beyond a reasonable doubt." See, *e. g., Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

Since the sole contention on appeal, aside from the speedy trial point, relates to the failure by the government to furnish appellant with the FBI memorandum containing his own statement under Rule 16(a) and 18 U.S.C. § 3500, our conclusion that the government's failure was not prejudicial in the circumstances is sufficient for the determination that if error was committed it is harmless. See *United States v. Crisona,* 416 F.2d 107, 112–15 (2 Cir. 1969), *cert. denied,* 397 U.S. 961, 90 S.Ct. 991, 25 L.Ed.2d 253 (1970).

Though the point was not specifically raised either by timely objection at trial or on appeal, we turn to the question of whether, assuming that the May 26 interview should have been turned over to appellant, it was "plain error" to have permitted the cross-examination of the defendant concerning a narcotics transaction derived from the May 26 interview as well as the introduction in evidence of the admission then made by the defendant.

■ We cannot view Judge Neaher's rulings permitting the cross-examination and allowing the "statement" in evi-

---

5. In the April 24 statement Johnson gave the details of the robbery:

> "Davis, Barry, Bonner and I then entered the bank while Rozier and the man I did not know stayed with the car as lookouts.
> "Davis got the money from the vault, Bonner guarded the tellers and Barry and I guarded the officers. Davis and Bonner had guns. After we got the money we fled from the bank. Rozier was on the sidewalk in front of the bank, but had been standing just inside the door as I started to come out."

6. The various pleas of guilty were shown in the evidence presented.

7. Since the stipulation established the *corpus delicti,* the stipulation (facts which the government represented it could have proved) plus an uncorroborated confession linking the defendant to the crime are sufficient to support the conviction. *United States v. Braverman,* 376 F.2d 249, 253 (2 Cir.), *cert. denied,* 389 U.S. 885, 88 S.Ct. 155, 19 L.Ed.2d 182 (1967); see *Wong Sun v. United States,* 371 U.S. 471, 489 n. 15, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); 7 *Wigmore on Evidence* § 2072.

dence as "plain error." By denying knowledge of the contents of earlier statements which he, himself, had signed, appellant tendered the issue of his credibility. We think that, just as even a suppressed statement can be used on cross-examination to test the credibility of the defendant, *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), so may a statement improperly withheld from discovery, provided no prejudice has been shown as in the present case.

Nor was it "plain error" to admit the "statement" itself as independent evidence in rebuttal, for it was a direct admission by appellant of his participation in the bank robbery, which appellant had denied on both his direct and cross-examinations. It was also proper to prove the motive that appellant had robbed the bank in order to obtain funds to pay Garbelotto whom he feared, even if another crime was incidentally disclosed. See *United States v. Papadakis,* 510 F.2d 287, 294–95 (2 Cir.), *cert. denied,* 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975); and see Federal Rule of Evidence 404(b).

## II

■ Appellant further contends that the indictment against him should have been dismissed because the government was not ready for trial within six months of his arrest, as required by Rule 4 of the Rules Regarding Prompt Disposition of Criminal Cases adopted by this court.[8] We find this claim to be without merit.[9]

■ Appellant was arrested on April 24, 1972, and was arraigned before a United States Magistrate on the following day. On May 26, 1972, he appeared in court for waiver of indictment. The case was marked off when the defendant indicated that he did not trust the attorney who had been appointed for him and that he did not desire to be represented by anyone. The case was next scheduled for waiver of indictment on June 19, 1972, but again the matter was marked off when it was indicated that there would not be a waiver. When the defendant again refused to waive indictment on July 28, 1972, the government decided to go to the grand jury and obtain an indictment. The government argues, and Judge Neaher found, that during this entire period (from April 24 to July 28) plea negotiations were being conducted, in which the defendant was offered the possibility of treatment under the Narcotic Addict Rehabilitation Act (NARA) in return for his cooperation with the government. We have held that a period of delay caused by the government's honest belief that the defendant is cooperating with its efforts to enforce the drug laws is not to be included in the six-month period specified in

---

**8.** Rule 4 provides:

"In all cases the government must be ready for trial within six months from the date of the arrest, service of summons, detention, or the filing of a complaint or a formal charge upon which the defendant is to be tried (other than a sealed indictment), whichever is earliest. If the government is not ready for trial within such time, or within the periods as extended by the district court for good cause under rule 5, and if the defendant is charged only with non-capital offenses, then, upon application of the defendant or upon motion of the district court, after opportunity for argument, the charge shall be dismissed."

On April 1, 1973, the Second Circuit Rules were superseded by the Plan for Achieving Prompt Disposition of Criminal Cases adopted by the United States District Court for the Eastern District of New York. The Rules adopted under the Eastern District Plan are similar to those promulgated by the Second Circuit.

**9.** Appellant also alleges that the government failed to comply with Rule 3, which requires the government to be ready for trial within 90 days if the defendant is in custody. Even if this claim were established, it would not be a ground for dismissal of the indictment, since Rule 3 provides only that the defendant shall be *released from custody* if not brought to trial within 90 days. Only Rule 4, which requires the government to be ready within six months in all cases, provides *dismissal of the indictment* as a sanction for delay by the government. See *United States v. Fernandez,* 480 F.2d 726, 729 (2 Cir. 1973).

Rule 4. *United States v. Valot,* 481 F.2d 22, 24–25 (2 Cir. 1973).[10] Thus, the entire period from April 24 to July 28 must be excluded from the six-month period.

 Furthermore, when appellant was arraigned on August 2, 1972, his counsel indicated that he would not be ready for trial for a month or two. The delay resulting from appellant's counsel's lack of readiness cannot be charged against the government. See Rule 5(b) of the Rules Regarding Prompt Disposition of Criminal Cases. On October 25, 1972, the court set the matter for trial on December 11, at which time the government communicated to the court its readiness to proceed to trial. Neither the defendant nor his counsel were present in court at the time. While the defendant as well as the court should be informed of the government's readiness for trial, we have held that notice to the court alone is sufficient where there has been no prejudice to the defendant. *United States v. Pierro,* 478 F.2d 386 (2 Cir. 1973). Thus, less than five months elapsed from the end of the defendant's period of "cooperation" to the time the government communicated its readiness to proceed to trial, and at least part of this delay was attributable to defense counsel's lack of readiness. Accordingly, defendant's claim that he was denied a speedy trial must be rejected.

The judgment of conviction is affirmed.

---

**10.** Appellant indicated in his testimony at a hearing held by the District Court on his motion to dismiss for failure to receive a speedy trial that he never intended to cooperate with the government, and merely used his apparent "cooperation" as a ploy for stalling until his wife would give birth to a child. Transcript of May 16, 1973, at 205. In this connection we find it appropriate to quote the language used in *United States v. Valot, supra,* at 25:

"For the appellant even to claim that the period of cooperation applies to the Speedy Trial Rules offends reason; to use his own unconscionable perfidy as a basis for such a claim is even worse."