UNITED STATES of America, Appellee,

v.

**Calvin GOMEZ, Jr., Appellant.**

No. 83–1549.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1983.

Decided May 2, 1984.

Donald B. Fiedler, Fiedler Law Offices, Omaha, Neb., for appellant.

Ronald D. Lahners, U.S. Atty. D. Neb., Thomas D. Thalken, First Asst. U.S. Atty., Omaha, Neb., for appellee.

Before LAY, Chief Judge, FAGG, Circuit Judge, and NICHOL,* Senior District Judge.

FAGG, Circuit Judge.

Calvin Gomez, Jr. appeals his conviction for aiding and abetting a kidnapping. Gomez contends that the district court improperly admitted prejudicial evidence of other crimes, improperly instructed the jury concerning intent, and abused its discretion in sentencing. We affirm.

---

* The Honorable Fred J. Nichol, Senior United States District Judge for the District of South Dakota.

Viewing the evidence, as we must, in the light most favorable to the government, it appears that Gomez enlisted 16-year-old Joseph Moniz in a plan to obtain the custody of his infant son from Gomez' estranged wife, Winona Stabler. Apparently, Gomez wanted Moniz to go to the home of Bob and Cheryl Robinson, friends of Winona Stabler, and then have the Robinsons invite Ms. Stabler to their home. Then, after she arrived Moniz was to take incriminating photographs of Ms. Stabler and the Robinsons in bed, and using drugs. Additionally, Moniz was to force them to make damaging remarks into a tape recorder. Gomez was planning to use these items to blackmail his wife in gaining custody of his son.

On June 21, 1982, Gomez, without identifying himself, telephoned Mrs. Robinson to tell her that some free meat was being distributed to families in the area and that it would be dropped off at her home that evening. Gomez picked up Moniz that evening and drove him to the Robinsons, located on the Omaha Indian Reservation. When the Robinsons came out of their home to receive the meat, they were confronted by Moniz, masked and armed with a sawed-off shotgun. Moniz then entered the Robinsons' home, robbed them, tied Mr. Robinson to a chair, and raped Mrs. Robinson. Moniz had the Robinsons telephone Winona Stabler to come over, but she sensed that something was wrong and alerted the police. Nevertheless, Moniz managed to leave the Robinsons' house unapprehended.

In the late evening of July 2, 1982, Moniz appeared outside the rural residence of Hollis Stabler, Winona Stabler's father, also on the Omaha Indian Reservation. Moniz was wearing a ski mask and was armed with a shotgun. He pointed the gun at Mr. Stabler, who recognized Moniz' voice, and demanded to know the whereabouts of Winona Stabler. Mr. Stabler evaded Moniz and managed to get inside his house. Mrs. Stabler called the local police, who captured Moniz approximately an hour later alongside a road several miles from the Stabler home. Moniz admitted to an FBI agent his armed confrontation with Hollis Stabler that evening and stated that he had done this at the direction of Gomez, who wanted Moniz to shoot Winona Stabler in the hand and in the ankle. Moniz further admitted to the earlier rape, robbery, and kidnapping at the Robinson residence, which, he said, he also did at the direction of Gomez.

Gomez was charged with aiding and abetting the following crimes: the rape of Cheryl Robinson, the robbery of Bob and Cheryl Robinson, the kidnapping of Bob and Cheryl Robinson, and the use of a firearm in connection with the kidnapping of Bob and Cheryl Robinson. Gomez was also charged with possession of an unregistered sawed-off shotgun. Although Gomez admitted to instigating Moniz' entry of the Robinson home, he maintained that he had not intended for Moniz to rob or rape anyone. Additionally, Gomez claimed that he had urged Moniz, without success, not to use a weapon. Moniz, on the other hand, testified that Gomez had given him a sawed-off shotgun to use in connection with the incident, and he further stated that Gomez had directed him to rob the Robinsons and to rape Cheryl Robinson. Gomez was convicted on one count, aiding and abetting the kidnapping of Bob and Cheryl Robinson.

Gomez unsuccessfully tried to exclude any evidence regarding the July 2, 1982 incident at the Stabler residence. Moniz testified at trial that he went to the Stabler residence on July 2 with the express intention of shooting Winona Stabler in the hand and ankle, and that he did so at the direction of Gomez, who drove him to the Stabler residence. Mr. and Mrs. Stabler also testified at trial concerning the events of July 2. Gomez now claims that the district court committed reversible error by admitting this evidence.

██ Evidence of other crimes, wrongs or acts is not admissible to prove character, but it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or acci-

dent." *Fed.R.Evid.* 404(b). We have previously set out the applicable standards to determine whether evidence of other crimes, wrongs, or acts is admissible. For the evidence to be admissible, the following requirements must be met: (1) the evidence must be relevant to a material issue other than the character of the defendant; (2) the evidence of other wrongful acts must be clear and convincing; and (3) the probative value of the evidence must not be substantially outweighed by the danger of unfair prejudice. *United States v. Turpin*, 707 F.2d 332, 336 (8th Cir.1983); *United States v. Huckaby*, 698 F.2d 915, 920–21 (8th Cir. 1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1526, 75 L.Ed.2d 948 (1983); *United States v. Evans*, 697 F.2d 240, 247–48 (8th Cir. 1983), *cert. denied*, —— U.S. ——, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). The district court has broad discretion in ruling on the admissibility of evidence of other crimes or acts. *United States v. Evans, supra*, 697 F.2d at 248.

■ In this case, the district court weighed the various factors, concluded that the evidence concerning the July 2 incident at the Stabler residence was relevant to the issue of motive or intent, and decided to admit the evidence. In our view the evidence was admissible to show motive. It was the government's position that Gomez' motive for instigating the Robinson incident was to gain custody of his son from his estranged wife. Because the July 2 incident, aimed as it was at reducing Winona's effectiveness as a custodial parent, was induced by this same desire of regaining custody of his son, the later incident was evidential of the reason that prompted Gomez to participate in the first incident. *See United States v. Turpin, supra*, 707 F.2d at 336; *United States v. Beechum*, 582 F.2d 898, 911–12 n. 15 (5th Cir.1978), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Johnson*, 525 F.2d 999, 1006 (2d Cir.), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976). *See also Wigmore on Evidence* §§ 117, 119, 385, 387, 395–97 (3d ed. 1940). The combined testimony of Moniz and the Stablers with regard to this incident was clear and convincing. Further, the judge cautioned the jury concerning the limited purpose and relevance of the evidence after each witness testified to the incident and again in the final charge to the jury. *United States v. Turpin, supra*, 707 F.2d at 336. We cannot say, on balance, that the probative value of the evidence was substantially outweighed by unfair prejudice. Considering all of these factors, we believe that the district court did not abuse its discretion in deciding to admit the evidence of the July 2 incident.

■ Gomez next challenges the district court's instructions on aiding and abetting in the commission of a crime. Instruction 23 sets forth the elements of the crime and requires that Gomez "did knowingly and willfully aid, abet, counsel, command, induce, procure or willfully cause Joseph Manuel Moniz to commit said acts." Initially, Gomez maintains that this instruction is confusing because it fails to provide any definition of the essential terms "aid, abet, counsel, command, induce, procure." We disagree. In making this argument Gomez has chosen to ignore Instruction 27 which sets forth the basic elements of aiding and abetting. *See United States v. Brim*, 630 F.2d 1307, 1311 (8th Cir.1980), *cert. denied*, 452 U.S. 966, 101 S.Ct. 3121, 69 L.Ed.2d 980 (1981).

■ Gomez also attacks Instruction 23 because it fails to inform the jury that the aider and abetter must share in the criminal intent of the principal. *See United States v. Untiedt*, 493 F.2d 1056, 1058 (8th Cir.), *cert. denied*, 419 U.S. 862, 95 S.Ct. 115, 42 L.Ed.2d 98 (1974), *quoting Johnson v. United States*, 195 F.2d 673, 675 (8th Cir.1952); *United States v. Hill*, 464 F.2d 1287, 1289 (8th Cir.1972). Instruction 23 should not be viewed in isolation, but must be considered in the context of the overall charge. *Cupp v. Naughten*, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *United States v. Foley*, 683 F.2d 273, 279 (8th Cir.1982). Most important for our purposes is Instruction 27, which provides in part as follows:

In order to aid, abet, counsel, command, induce or procure another to commit a crime it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say, that he willfully seeks by some act or omission of his to make the criminal venture succeed.

As stated previously, an act or omission is "willfully" done, if done voluntarily and intentionally and with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or to disregard the law.

See E. Devitt and C. Blackmar, *Federal Jury Practice and Instructions* § 12.03 (3d ed. 1977). Although the district court chose not to use the wording proposed by Gomez, it is sufficient if the instructions given to the jury adequately and correctly cover the applicable law, as we believe they do. *United States v. Wilkerson,* 691 F.2d 425, 428 (8th Cir.1982); *United States v. Williams,* 604 F.2d 1102, 1120 (8th Cir. 1979). It is of course the substance of the instruction rather than the form which determines its correctness.

■ Last, Gomez argues that the 40-year sentence imposed upon him by the district court is excessive and the result of a misclassification of the felony involved. Absent exceptional circumstances, "a sentence imposed by a federal district judge, if within statutory limits, is generally not subject to review." *United States v. Tucker,* 404 U.S. 443, 447, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). *See also United States v. Catch The Bear,* 727 F.2d 759, 760, 761 (8th Cir.1984).

■ Gomez first claims that it was improper for the district judge to consider the fact that Moniz committed a rape, since Gomez was acquitted on the charge of aiding and abetting the rape. We disagree. The district court was correct in considering all facets of the crimes perpetrated upon the Robinsons, including the rape, which stemmed from a kidnapping set in motion by Gomez. The district court was aware that Gomez was not convicted of aiding and abetting the rape, but it nevertheless concluded, properly we think, that it could and should consider that Gomez created the situation in which this act occurred.

■ Gomez also maintains that the district judge misclassified the felony, and as a result, imposed an unusually harsh sentence. The controlling state statute provides that kidnapping generally is a class IA felony, but "[i]f the person kidnapped was voluntarily released or liberated alive by the abductor and in a safe place *without having suffered serious bodily injury,* prior to trial, kidnapping is a Class II felony." Neb.Rev.Stat. § 28–313 (1979) (emphasis added). The district court held that since the Robinsons were not voluntarily released, and since Mrs. Robinson had been raped, which the district judge considered a "serious bodily injury," the offense should be classified as a Class IA felony. Gomez argues that under the Nebraska statutory scheme, rape is not a "serious bodily injury." It is not necessary for us to consider this question of construction of the state statute. The district judge carefully considered a variety of factors in arriving at the 40-year sentence, including Gomez' background, the seriousness of the events of June 21, 1982, and Gomez' previous involvement with similar incidents. We are not persuaded that the classification of the felony was a significant factor in the sentencing decision. In any event, the sentence was well within the statutory limits whether it was classified as a Class IA felony or even as a Class II felony. Under the circumstances, we cannot conclude that the district court abused its discretion in sentencing Gomez.

Affirmed.