UNITED STATES of America, Appellee,

v.

Jeffrey GRUBCZAK,
Defendant-Appellant.

No. 807, Docket 85-1409.

United States Court of Appeals,
Second Circuit.

Argued March 18, 1986.

Decided June 16, 1986.

Steven M. Kaplan, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Stuart E. Abrams, Asst. U.S. Atty., of counsel), for appellee.

Judd Burstein, New York City, for defendant-appellant.

Before PIERCE, MINER and ALTIMARI, Circuit Judges.

MINER, Circuit Judge:

Jeffrey Grubczak appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Owen, J.) following a jury trial in which he was found guilty on all counts of a three-count indictment charging him with: (1) conspiracy to rob money belonging to federally insured banks, 18 U.S.C. § 371; (2) armed robbery and aiding and abetting the armed robbery of bank funds, 18 U.S.C. §§ 2113(d), 2; and (3) receipt and possession of money belonging to a federally insured bank knowing it had been stolen, and aiding and abetting the same, 18 U.S.C. §§ 2113(c), 2. Defendant was sentenced to concurrent terms of five years' imprisonment on count 1, twenty-five years' imprisonment on count 2 and ten years' imprisonment on count 3. He also was fined a total of $750,000 and ordered to pay a special assessment of $150. Defendant's principal contention on appeal is that the evidence at trial was insufficient to support the jury's verdict with respect to aiding and abetting the armed robbery of bank funds. We affirm.

## I. BACKGROUND

In the early morning hours of April 29, 1985, a group of armed bandits broke into the offices of the Wells Fargo Armored Services Corporation ("Wells Fargo") on West Street in Manhattan. The robbers apparently had entered the building by cutting through a cement block wall into the second floor office area. There, they waited until approximately 1:15 a.m. when four armed Wells Fargo guards had completed a search of the building. After deactivating the alarm system and opening the main vault, the robbers quickly subdued the guards, who were then disarmed and handcuffed to a forklift. None of the guards was able to identify the three gunmen, who were wearing masks.

The robbers removed approximately $7.9 million in cash from the vault and loaded the money into the back of a Wells Fargo armored car. Fleeing in the armored car, the robbers soon realized that they had left

behind the body key. That key was necessary to open the car's back compartment where they had placed the money. The robbers proceeded to a New York City Highway Department storage lot near the Fulton Fish Market in lower Manhattan, where they parked the armored car. There, they were seen by Allan Merritt, a truck driver who had parked his truck next to the Highway Department lot. Sometime after 1:30 a.m., Merritt observed defendant walking with another person in the vicinity of the storage lot. Merritt knew defendant from working in the area and made the observation at a distance of less than five feet.

At approximately 2:00 a.m., Merritt heard a loud banging noise coming from the direction of the Highway Department lot. He then saw defendant hitting the side of the Wells Fargo truck with what appeared to be a sledge hammer or ax. Merritt simultaneously observed five or six individuals who seemed to be serving as lookouts. After about ten minutes, a police car approached the area, causing defendant and the others to scatter. A short time later, Merritt saw the group return; he witnessed defendant and another resume the battering of the armored car. Eventually, Merritt saw that the door had been opened, and he watched as the two unloaded packages from the armored car into a white van. At approximately 3:30 a.m., he saw defendant and another individual leave the lot in the white van. The lookouts also departed, leaving the armored car behind. Government agents recovered the damaged car later that morning; although none of the stolen money was recovered, an unidentified discarded revolver was found in the Wells Fargo vehicle.

Testimony at trial established that defendant's life-style changed substantially after the robbery. Friends observed that he was better dressed and heard him brag that his "ship had come in." Although he had always been short of money, he told a friend in early May that he had just flown first class to Chicago and had taken a limousine to the airport. While in Chicago, defendant left approximately $5,400 cash with his mother. He also had deposited $2,000 into his bank account and told Merritt that he had just bought a car. Less than one year earlier, defendant had listed on a financial aid form that his net worth was zero and that his anticipated income was less than $2,200.

On May 29, 1985, an arrest warrant was issued charging defendant with participating in the April 29th Wells Fargo robbery. Officers arrived at defendant's apartment that evening, where they observed a number of items. One of the officers noticed a number of small explosive devices as well as a pair of large red-handled bolt cutters of the type believed to have been used during the robbery. A second officer, Special Agent Philip Lewzader, noticed ten to twelve credit cards, bound with a rubber band, on a couch. The cards were not in defendant's name. Next to the cards was a black zippered case approximately five inches long and one and one-half inches wide. Based on nine years' experience with the FBI, including service with the Joint Bank Robbery Task Force, Lewzader immediately suspected that the case contained lock-picking tools. This belief was supported in part by his knowledge that defendant had been charged with burglary in the past. Lewzader's suspicions were heightened when he picked up the case and was able to discern its sound and feel. When opened, the case did in fact contain the suspected items.

When informed at the time of his arrest that the police were going to obtain a search warrant for his apartment, defendant told one of the arresting officers that they were going to "find about $8,000 there" which defendant explained came from his being "a good saver." Following the arrest and issuance of a search warrant, agents seized $8,900 in $10 bills stacked and bound by a rubber band. They also discovered a Federal Reserve Bank money wrapper of the type used to wrap some of the stolen money.

Most of this evidence was introduced at trial. In addition, the government sub-

mitted evidence of defendant's attempt to obstruct justice by suborning the perjurious alibi testimony of two witnesses. Both of those witnesses, however, ultimately testified for the government.

As part of his defense case, defendant called Special Agent Lewzader, who testified that an investigation was unable to establish that the bolt cutters found in defendant's apartment had cut the lock on the Highway Department lot's gate. Lewzader also testified that none of the latent fingerprints found at the crime scene could be identified as defendant's. Other defense witnesses were Michael Sentina and Alan Smaltz, whose testimony was used to explain some of the items seized from defendant's apartment. Sentina explained that defendant made use of the bolt cutters in his work as a handyman; Smaltz testified that defendant had been doing carpentry work and some locksmithing, thereby suggesting an explanation for the lock-picking tools.

## II. DISCUSSION

Defendant urges three grounds for reversal of his conviction, only one of which requires extended discussion. First, defendant argues that the district court erroneously denied his motion to suppress the lock-picking tools. According to defendant, Judge Owen erred in finding that the lock-picking tools were properly seized on the basis of the plain view exception to the fourth amendment's warrant requirement. *See Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971) (plurality opinion). That doctrine consists of three elements: First, the officer must be lawfully on the premises. Second, the discovery of the evidence must be inadvertent. Third, the incriminating nature of the evidence must be immediately apparent. *United States v. $10,000 in United States Currency,* 780 F.2d 213, 217 (2d Cir.1986).

Defendant's only claim here is that the incriminating nature of the lock-picking case was not immediately apparent. The predicate for this argument is that Agent Lewzader did more than just look at the case; he testified that he picked it up and shook it. Regardless of the applicability of the "plain feel" version of the plain view doctrine to the facts of this case, *see United States v. Ocampo,* 650 F.2d 421, 429 (2d Cir.1981) (approving "plain feel" concept where agents were able to discern currency through paper bag); *United States v. Diaz,* 577 F.2d 821, 824 (2d Cir.1978) (same, where contents of paper bag inside a filled toilet tank were likely soon to deteriorate), there simply is no merit to defendant's claim that the plain view doctrine here was misapplied. Indeed, defendant has mischaracterized the facts supporting a finding of plain view. While Agent Lewzader did pick up the case and undertake a tactile examination, his unequivocal testimony was that he had *concluded* that the case contained lock-picking tools *before* he picked it up. His additional survey served only to support his already formed conclusion as to the case's contents. That conclusion, predicated on his lengthy experience and his knowledge that defendant had been charged with burglary in the past, plainly supported his probable cause belief that the case was connected with criminal activity. *See Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 3324, 77 L.Ed.2d 1003 (1983); *United States v. $10,000 in United States Currency,* 780 F.2d at 217 (" '[T]he incriminating nature of an object is generally deemed "immediately apparent" where police have probable cause to believe it is evidence of crime.' " (quoting *United States v. Ochs,* 595 F.2d 1247, 1258 (2d Cir.1979)). Accordingly, Judge Owen properly denied defendant's motion to suppress.

Equally meritless is defendant's contention that the prosecutor improperly elicited testimony that, subsequent to his arrest, defendant invoked his fifth amendment right to remain silent. In the course of introducing defendant's spontaneous post-arrest statement that the agents searching his apartment would find $8,000 in cash, the government also elicited testimony regarding defendant's invocation of his rights under *Miranda v. Arizona,* 384

U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The relevant government questioning of the arresting officer was as follows:

Q: Can you tell us what you said to him when you first saw him?

A: When I first saw him, I introduced myself and I advised him of his constitutional rights and asked him if he was willing to answer any questions.

Q: What did he say when you asked him if he was willing to answer any questions?

A: He said that he would not.

Defense counsel immediately objected and a sidebar conference ensued. Judge Owen specifically sustained counsel's objection with respect to the post-arrest refusal to answer any questions, but did not make that ruling clear to the jury. Significantly, however, defense counsel made no request that the ruling be communicated to the jury; nor did he request any limiting or curative instructions. Indeed, at the sidebar, counsel expressly stated his willingness to "stand on the record." This failure to seek any limiting instruction constitutes a waiver of appellate review. *See United States v. Katz*, 601 F.2d 66, 67 (2d Cir. 1979); *United States v. Canniff*, 521 F.2d 565, 572 (2d Cir.1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976); *United States v. Indiviglio*, 352 F.2d 276, 280 (2d Cir.1965) (in banc), *cert. denied*, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). In any event, this was not a case in which the government sought to impeach the defendant based on his post-arrest silence, or to claim some significance in the defendant's refusal to answer a particular question. *See Doyle v. Ohio*, 426 U.S. 610, 618–20, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976); *United States v. Hale*, 422 U.S. 171, 180, 95 S.Ct. 2133, 2138, 45 L.Ed.2d 99 (1975). Indeed, the fact was not referred to at all in the government's arguments. *Cf. Hawkins v. LeFevre*, 758 F.2d 866, 878–79 (2d Cir.1985) (not harmless error where trial judge referred repeatedly to post-arrest silence).

We come then to defendant's principal argument on appeal—that the evidence was insufficient to support his conviction for aiding and abetting an armed robbery. Specifically, defendant contends that the government failed to prove that he knew his co-conspirators would be using guns in the robbery of Wells Fargo.[1]

At the outset, it should be noted that defendant does not appear to contend that the evidence was insufficient to support a conviction for bank robbery in violation of 18 U.S.C. § 2113(a). Instead, his focus is on that aspect of the government's case imputing to him knowledge of the use of a dangerous weapon. From defendant's point of view, the importance of this added element may be found in 18 U.S.C. § 2113(d), which serves to enhance the available maximum sentence under section 2113(a) by five years.

We hardly need reiterate that a defendant advancing a sufficiency of the evidence claim "bears a 'very heavy burden.'" *United States v. Martino*, 759 F.2d 998,

---

1. Our task here is made simpler because the government does not dispute the apparently well-settled rule that a conviction for aiding and abetting an armed bank robbery under 18 U.S.C. § 2113(d) requires proof that the defendant knew that a weapon was used. Although our court never has been squarely presented with this precise question, dictum in *United States v. Wardy*, 777 F.2d 101, 106 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986), suggests acceptance of the prevailing view that in a prosecution for aiding and abetting armed bank robbery, the government must establish not only that the defendant knew that a bank was to be robbed and became associated and participated in that crime, but also that the defendant "'knew that [the princi-pal] was armed and intended to use the weapon, and intended to aid him in that respect.'" *United States v. Longoria*, 569 F.2d 422, 425 (5th Cir.1978) (quoting *United States v. Short*, 493 F.2d 1170, 1172 (9th Cir.), *cert. denied*, 419 U.S. 1000, 95 S.Ct. 317, 42 L.Ed.2d 275 (1974)); *accord United States v. McCaskill*, 676 F.2d 995, 998 (4th Cir.), *cert. denied*, 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982); *United States v. Sanborn*, 563 F.2d 488, 491 (1st Cir.1977); *see United States v. Johnson*, 390 F.Supp. 1049, 1056 n. 5 (E.D.N.Y.), *aff'd*, 525 F.2d 999 (2d Cir.1975), *cert. denied*, 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 327 (1976); *cf. United States v. Medina*, 709 F.2d 155, 158–59 (2d Cir.1983) (Mishler, J., dissenting). *But see United States v. Schultz*, 769 F.2d 431 (7th Cir.1985).

1002 (2d Cir.1985) (quoting *United States v. Soto,* 716 F.2d 989, 991 (2d Cir.1983)). The question simply is "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt." *United States v. Soto,* 716 F.2d at 991 (quoting *United States v. Carson,* 702 F.2d 351, 361 (2d Cir.), *cert. denied,* 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983)). In making that determination, we "must view the evidence in the light most favorable to the government," *United States v. Martino,* 759 F.2d at 1002; *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed.2d 680 (1942), and construe all permissible inferences in its favor. *United States v. Orozco-Prada,* 732 F.2d 1076, 1081 (2d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 154, 83 L.Ed.2d 92 (1984). If "*any* rational trier of fact could have found the essential elements of the crime," the conviction must be affirmed. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

Although the evidence against defendant on the armed robbery count is far from overwhelming, we are persuaded that, viewed in its totality, *see United States v. Carson,* 702 F.2d at 362, it is sufficient to sustain the conviction.

■ The aider and abettor statute, 18 U.S.C. § 2(a), provides that whoever "aids, abets, counsels, commands, induces or procures [the] commission" of an offense is punishable as a principal. For such criminal liability to attach, it is not necessary that a defendant know all the details of a crime. *United States v. Wardy,* 777 F.2d 101, 107 (2d Cir.1985) (citing *United States v. DeFiore,* 720 F.2d 757, 763 (2d Cir.1983), *cert. denied,* 466 U.S. 906, 104 S.Ct. 1684, 80 L.Ed.2d 158 (1984)), *cert. denied,* —— U.S. ——, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986). It is sufficient that the defendant "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Perry,* 643 F.2d 38, 46 (2d

Cir.), *cert. denied,* 454 U.S. 835, 102 S.Ct. 138, 70 L.Ed.2d 115 (1981) (quoting *United States v. Peoni,* 100 F.2d 401, 402 (2d Cir. 1938)); *see also United States v. Wardy,* 777 F.2d at 107.

■ In a prosecution for aiding and abetting an armed bank robbery, a defendant's "knowledge that use of a dangerous weapon was fairly within the robbery plan need not, of course, be shown by explicit proof of expressed intention; the jury may infer such knowledge from the whole circumstances." *United States v. Sanborn,* 563 F.2d 488, 491 (1st Cir.1977). Moreover, the government need not necessarily show the defendant actually *knew* a dangerous weapon would be used; rather, all that need be demonstrated is that the defendant "was on notice of the likelihood of its use." *Id.; see also United States v. McCaskill,* 676 F.2d 995, 998 (4th Cir.), *cert. denied,* 459 U.S. 1018, 103 S.Ct. 381, 74 L.Ed.2d 513 (1982).

■ We are satisfied that, based upon the "whole circumstances," *United States v. Sanborn,* 563 F.2d at 491, there was sufficient evidence from which the jury reasonably could infer that defendant was aware of the likelihood that a gun would be used. The robbery of a heavily secured Wells Fargo depository is not the type of venture ordinarily to be accomplished without the use of weapons. The *modus operandi* of these robbers certainly supports a jury's common sense inference to that effect. The Wells Fargo bandits were a sophisticated and organized armed group who easily subdued and disarmed four professional security guards. It is not at all unreasonable for a jury to conclude that even a supporting actor in such a drama had to be aware of the likelihood that weapons would be used. *See United States v. McCaskill,* 676 F.2d at 999 (in discussing "sticking up" a bank, defendants must have contemplated "the use of some weapon with which to 'stick up' the bank.").

■ Similarly, the very means by which the robbers effected the initial transport of

the money, theft of the armored car, fairly entitled the jury to infer knowledge on the part of defendant that a gun would be used. It would be most unrealistic to suggest that defendant might conclude that theft of a Wells Fargo armored car containing nearly eight million dollars in stolen money would not entail the use of weapons. The missing car, when discovered and pursued, would most certainly be met with heavily armed law enforcement personnel. *Cf. United States v. Wardy*, 777 F.2d at 106 ("even assuming that the robbers did know that the bank had stopped using armed guards, and that the robbery would take only a moment, there was always the possibility that passing police would notice two men running from the vestibule of a bank, especially if they were pursued by a uniformed guard."). It is important to note that the robbery of a Wells Fargo facility, particularly when accompanied by the theft of an armored car, is readily distinguishable from other forms of bank robbery. Attendant upon such a venture is a far greater risk of encounter with arms and armor, and therefore, a more obvious likelihood that the use of weapons by the robbers would be required.

Independent of these considerations, there is no doubt that the evidence of defendant's substantial involvement strongly supports the conclusion that he was one of the principal players in the robbery. As such, the inference that he had to have been aware of the likely use of a gun is compelling. Significantly, immediately after the stolen armored car was delivered to the Highway Department lot, defendant was seen endeavoring strenuously to enter it. For more than an hour, defendant, for the most part by himself, battered away at the car with a sledge hammer. When ultimately successful, defendant himself transferred the stolen cash into the white van and drove off with the loot. At a minimum, defendant played the lead role in the final phase of the robbery. Moreover, the evidence at trial amply demonstrated that defendant shared in the proceeds of the robbery. Clearly, one "so closely associated with the venture could not fail to know

what would be the central question in any robbery: how the robbers were to force the [Wells Fargo] employees to part with the money." *United States v. Sanborn*, 563 F.2d at 490; *cf. Pereira v. United States*, 347 U.S. 1, 12–13, 74 S.Ct. 358, 364–65, 98 L.Ed. 435 (1954).

Finally, there was at least some evidence to support the conclusion that defendant actually was aware of the presence of weapons during the robbery. When the armored car was recovered some hours after defendant had left the scene, a revolver was found on the floor of the passenger side. The testimony and evidence at trial clearly established that defendant had spent over an hour battering his way into the truck. Indeed, most of his efforts were concentrated in the area of the passenger-door window, and that is the point through which access to the armored car, and, ultimately, to the money, was gained. Surely, the jury would have been justified in finding that defendant could not have failed to observe the presence of the gun. Since the robbery itself was continuing through this escape phase, *United States v. Martin*, 749 F.2d 1514, 1518 (11th Cir.1985); *United States v. Willis*, 559 F.2d 443, 444 (5th Cir.1977), defendant's knowledge of a weapon at this point was sufficient to support a conviction for aiding and abetting an armed robbery.

In sum, we conclude that the evidence adduced at trial, together with rational inferences to be drawn therefrom, adequately supported a jury finding that defendant was aware of the likelihood that a dangerous weapon was to be used during the course of the Wells Fargo robbery.

## III. CONCLUSION

Accordingly, the judgment of conviction is affirmed.