**UNITED STATES of America, Appellee,**

v.

**CHANG AN-LO, a/k/a "White Wolf", Shiang Bao-Jing, a/k/a "Cripple", George Qi Lu, Peter Yang, Lam Tso, a/k/a "Sammy Lam", John Kirkpatrick, Ah Min, Jack Ma, a/k/a "Jack Li", Tung Kuei-Sen and Chen Chih-Yi, a/k/a "Yellow Bird", Defendants-Appellants.**

**No. 1318, Dockets 86-1506, 86-1507 to 86-1512, 87-1001, 87-1002, 87-1013 and 87-1029.**

United States Court of Appeals, Second Circuit.

Argued Aug. 10, 1987.

Decided June 27, 1988.

---

William M. Kunstler, New York City (Jay Gregory Horlick, Brooklyn, N.Y., of counsel for defendant-appellant Chang An–Lo; Jeffrey A. Lazroe, Buffalo, N.Y., of counsel for defendant-appellant Chen Chih–Yi), for defendants-appellants Chang An–Lo and Chen Chih–Yi.

Philip Katowitz, Brooklyn, N.Y., for defendant-appellant Shiang Bao–Jing.

Bobbi C. Sternheim, New York City, for defendant-appellant George Qi Lu.

Lorin Duckman, New York City, for defendant-appellant Peter Yang.

Michelle S. Jacobs, New York City, for defendant-appellant Lam Tso.

Robert E. Precht, New York City (The Legal Aid Defender Services Unit, New

York City, of counsel), for defendant-appellant John Kirkpatrick.

Lee A. Ginsberg, New York City (Freeman, Nooter & Ginsberg, New York City, of counsel), for defendant-appellant Ah Min.

Eugene Bogan, New York City, for defendant-appellant Jack Ma.

Lawrence Gross, Elmhurst, N.Y. (Gering, Gross & Gross, Elmhurst, N.Y., of counsel), for defendant-appellant Tung Kuei–Sen.

Anne T. Vitale, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Bruce Green, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Before WINTER and MAHONEY, Circuit Judges, and STEWART, District Judge.[*]

MAHONEY, Circuit Judge:

Defendants-appellants appeal from judgments entered upon their convictions by a jury after an eight week trial in the United States District Court for the Southern District of New York, Robert L. Carter, *Judge.* They were charged in a fourteen count indictment. Count one alleged a RICO conspiracy to conduct the affairs of United Bamboo, a criminal enterprise which originated in Taiwan approximately thirty years ago and is active in the United States, through a pattern of racketeering activity involving the murder of journalist Henry Liu in Daly City, California on October 15, 1984, various narcotics conspiracies and distributions, and interstate travel in aid of racketeering. Count two alleged the conduct of that enterprise's affairs as aforesaid. Counts three through ten alleged various narcotics conspiracies and distributions. Count eleven charged interstate travel in aid of racketeering, counts twelve and thirteen charged illegal transportation and receipt of firearms in interstate commerce, and count fourteen charged a conspiracy to counterfeit a United States passport. All defendants-appellants were charged with and convicted of one or more crimes, and sentenced to terms ranging from twenty-five years for Lam Tso to time served of one year for Peter Yang.

Appellants raise numerous issues on appeal. We affirm, except that we remand as to defendants-appellants George Qi Lu and Tung Kuei–Sen for compliance with Fed.R. Crim.P. 32(c)(3)(D). We consider herein defendants-appellants' contentions concerning the sufficiency of the evidence as to certain defendants, the refusal of the trial judge to grant certain defendants' motions for severance which allegedly resulted in an unfair trial, the admissibility of a duplicate foreign business record when the supporting witness had never seen the original, the propriety of the trial judge's *ex parte* examination of certain jurors concerning one juror's reading a newspaper report concerning the case prior to allowing defense counsel the opportunity to interview the jurors, whether the alleged inconsistency between verdicts on RICO counts and non-RICO counts charging identical conduct requires reversal of conviction, and the conduct of the sentencing proceedings with respect to defendants George Qi Lu and Tung Kuei–Sen.

## I. Background

### A. *The United Bamboo.*

This case involves the activities of a Chinese organized crime syndicate, the United Bamboo. The United Bamboo was founded in Taiwan approximately three decades ago. Over the years, the enterprise has extended its activities to Hong Kong, Japan, the Philippines, Singapore, and most recently the United States. In this country, the United Bamboo has established its operations in Houston, Los Angeles, San Francisco and New York. The members and associates of the organization in the United States established the United Bamboo's presence here through involvement in various illegal activities such as prostitu-

---

[*] The Honorable Charles E. Stewart, Jr., of the United States District Court for the Southern District of New York, sitting by designation.

tion, illegal gambling, assisting fugitives from justice, extortion, kidnapping, murder, and trafficking in guns and narcotics.

The United Bamboo's international leader, Chen Chi–Li, came to Los Angeles in September, 1984 for a series of meetings with members and associates of the United Bamboo, including the defendant Chang An–Lo, the leader of the United Bamboo in the United States; the defendant Chen Chih–Yi, the financial leader of the organization in the United States; and the defendant Tung Kuei–Sen, among others, to discuss plans that would expand the group's activities here.

To demonstrate its strength and capability, the United Bamboo planned to murder Henry Liu, a Taiwanese journalist who had written critically of the Taiwanese government. After careful planning by Chen Chi–Li and his associates, one Wu Tun and defendant Tung Kuei–Sen murdered Henry Liu during the early morning hours of October 15, 1984 at Liu's home in Daly City, California. Four days after the murder, Chen Chi–Li, Wu Tun and Tung Kuei–Sen fled the United States and returned to Taiwan with the help of Chen Chih–Yi.

As a result of the shock and outcry over Henry Liu's murder, Taiwan began the "I Ching," a crackdown on the underworld in Taiwan. The "I Ching" was successful in arresting numerous Chinese underworld figures, including Chen Chih–Yi. As a result of the disruption of the United Bamboo's activities caused by the "I Ching," the organization sought to raise money in support of members and associates who had been arrested and further sought to aid fugitives who had left Taiwan.

In furtherance of United Bamboo's expansion plan, Chang An–Lo contacted one Steven Wong numerous times and asked him to provide specific information about the street gangs and their criminal activity in New York's Chinatown. Chang An–Lo intended to use that information to take over and profit from criminal activities in Chinatown.

In March, 1985, however, Steven Wong began to work in an undercover capacity for the New York City Police Department, and thereafter for the Federal Bureau of Investigation. After providing the authorities with information pertaining to the murder of Henry Liu and the United Bamboo's proposed activities in Chinatown, Wong proceeded to record numerous conversations with various defendants during the course of a five month investigation, some hundred of which were used as evidence at trial. The investigation revealed separate but related schemes to acquire and distribute narcotics in order to raise money for United Bamboo.

B. *The Heroin–Cocaine Conspiracy.*

The first plan involved a conspiracy to obtain and distribute heroin and cocaine between April and September, 1985. Defendants Chang An–Lo, Shiang Bao–Jing, George Qi Lu, Lam Tso and Tony Wong [1] participated in this conspiracy, which, while ultimately unsuccessful, resulted in the sale of one pound of heroin and the distribution of three additional samples of heroin to undercover law enforcement officers.

The government proved the existence of the conspiracy through the surveillance of numerous meetings between certain of the defendants and Steven Wong (and other undercover officers) during the period in question. At those meetings, many of which took place in April and May, 1985, matters relating to the attempted establishment of a substantial narcotics trade were revealed. Chang An–Lo made several statements about his "connections" in the Golden Triangle, an area in Southeast Asia known for heroin production. He also told Wong of his plans to "take over" Chinatown. Moreover, Chang gave Wong express authority to arrange narcotics transactions with the defendant Lam Tso. Throughout May and June, 1985, Lam Tso, who was based in New York, continuously attempted to secure a source for heroin through the help of defendant George Qi Lu.

---

**1.** Although a defendant and convicted below, Tony Wong is not a party to this appeal.

In this connection, Lam Tso told Steven Wong on May 24, 1985, that George Qi Lu would be meeting a heroin source in Los Angeles and arranging narcotics transactions on behalf of Lam Tso and Steven Wong. In addition, George Qi Lu arranged on one occasion for Chang An–Lo to meet with Lu's heroin source from the Golden Triangle.

On June 6, 1985, Chang An–Lo was arrested on charges of kidnapping and extortion.[2] Defendant Shiang Bao–Jing then became the leader of the United Bamboo in Los Angeles, and continued to carry out Chang's plan for the organization's development.[3] On June 19, 1985, at a meeting in Los Angeles with Steven Wong, two undercover officers and defendant George Qi Lu, Shiang Bao–Jing told of a ten point plan that he had designed to carry out the development of United Bamboo in the United States that Chang had initiated. One of the elements of the plan was narcotics trafficking. In that connection, on June 20, 1985, Shiang discussed available sources for narcotics.

On the evening of June 19, 1985, Steven Wong discussed narcotics sources with defendant George Qi Lu, as well. Lu told Wong that he too had available sources for heroin. Lu described how he had brought a particular source to New York to meet with Lam Tso on two occasions in order to arrange a drug deal. Concurrently, over the next several days, Shiang indicated his awareness of his associates' efforts to bring about narcotics sales, and began to pursue the opportunities available to secure narcotics by personally dealing with Lu's source, despite Shiang's distrust of that source.

Upon his return to New York, Wong kept in touch with Shiang Bao–Jing regarding the proposed narcotics transactions. On July 15, 1985, Shiang advised Wong that he would set up meetings for Wong with narcotics sources when Wong next returned to the west coast area, and that samples of both heroin and cocaine would be readily available. On July 20, 1985, Shiang Bao–Jing actually brought a narcotics source to Las Vegas to meet with other members of the conspiracy, but that meeting went awry.

The defendants' efforts to obtain heroin and cocaine from their contact from the Golden Triangle never came to fruition. However, Lam Tso was able to make arrangements through other sources, which resulted in a sale of 354 grams of heroin for $48,000 by Tony Wong and Lam Tso to Steven Wong and two undercover law enforcement associates on July 26 and 27, 1985. Further, Lam Tso delivered two more samples of heroin to Steven Wong on July 30, and another sample on August 15, 1985.

### C. *The Marijuana–Cocaine Conspiracy.*

The second conspiracy involved the efforts of defendants Chen Chih–Yi, Jack Ma, John Kirkpatrick, Lam Tso and Tony Wong to distribute one hundred fifty pounds of marijuana between June and September, 1985. In addition, there was a plan to distribute cocaine, which resulted in Chen Chih–Yi supplying undercover officers with a sample of the drug. Once again, the government was able to prove the conspiracy largely through the efforts of Steven Wong and the other undercover officers.

---

**2.** Chang's arrest stemmed from an attempt to extort money from a merchant who owed a debt to members of the United Bamboo. Chang organized the kidnapping of Wang Chuo Tao, an employee of the merchant, in order to extort the money. Tao was released because she recognized Chang. After the release, Chang spoke with Wang Chuo Tao by telephone. During that conversation, which was recorded, Chang admitted his role in the kidnapping, and was subsequently arrested.

**3.** While Shiang only assumed control over the Los Angeles operation after Chang's arrest, Shiang had been a trusted associate and had fully participated in the conspiracy, prior to that time. Shiang partook in several of the aforementioned meetings and conversations in April and May, 1985. Specifically, Shiang discussed taking over Chinatown, and said that he believed New York was a good place to "hustle." He also told Wong that he could easily smuggle narcotics and other contraband into the United States in his metal crutches without being detected.

On June 25, 1985, Steven Wong met with Chen Chih–Yi in New York. At that meeting, among other things, Chen told Steven Wong of his capabilities of dealing in marijuana and cocaine. On June 26, 1985, Steven Wong presented Chen with a $5,000 deposit for one hundred pounds of marijuana that was eventually to be shipped from Texas to New York City. On July 1, 1985, Steven Wong, along with two undercover associates, went to Texas at Chen's invitation, where they were introduced to Chen's marijuana sources. Wong and his colleagues also met defendant Jack Ma for the first time during that trip, as well as other United Bamboo members. On July 2, 1985, Chen supplied Steven Wong with samples of marijuana and cocaine.

On July 31, 1985, Steven Wong wired Chen a further partial payment for the marijuana. In addition, Chen thereafter agreed to give the defendant Lam Tso an extra fifty pounds of marijuana on consignment, as well as six firearms. On August 7, 1985, the defendant John Kirkpatrick arrived by car in New York with the marijuana and firearms. After contacting Chen, who had been dining with Jack Ma, Lam Tso, Tony Wong, Steven Wong and Steven Wong's undercover associates, Kirkpatrick waited for them at a designated site. The parties then proceeded to a secluded area on the west side of Manhattan, where one of the undercover agents gave Jack Ma $25,000 in exchange for the marijuana and guns.

D. *The Conspiracy to Import and Distribute Three Hundred Kilograms of Heroin.*

The third phase of the United Bamboo plan involved a conspiracy to import and distribute three hundred kilograms of heroin into the United States in which defendants Chen Chih–Yi, Tung Kuei–Sen, Jack Ma, Peter Yang and Ah Min participated from June through September, 1985.

Steven Wong was first made aware of the details of the plan to obtain heroin on July 24, 1985. On that day, Chen told Wong that Tung Kuei–Sen had assured Chen that the "stuff" would be forthcoming from Thailand. At that point, Chen believed that after a smaller purchase, the conspiracy could obtain one hundred to two hundred kilograms of heroin for distribution. Thereafter, on August 13, 1985, Chen flew to Brazil to meet with Tung Kuei–Sen in Rio de Janeiro. Telephone calls were made to the telephone number of defendant Ah Min, the purported heroin source, in Thailand on August 13 and 15, 1985 from Tung's hotel room in Rio de Janeiro.

The negotiations for this transaction subsequently continued in New York City. At a meeting there on August 20, 1985, Chen introduced Peter Yang to Steven Wong, describing Yang as a trusted associate and one of the toughest members of the United Bamboo; an enforcer. The next day, Chen, accompanied by Yang, held another meeting regarding the heroin transaction, at which he reviewed the details of the transaction with two undercover agents who were the purported purchasers.

On September 13, 1985, Chen and Jack Ma arrived in New York with Ah Min. The three hundred kilogram heroin transaction was finalized during the next three days. On the morning of September 15, 1985, the purchasers handed over $50,000 to Chen to make any arrangements necessary to conclude the transaction. Shortly thereafter, the defendants were arrested.

As described earlier, the indictment, trial and conviction of the defendants-appellants ensued.

## II. Discussion

### A. *Sufficiency of the Evidence.*

Defendants Shiang Bao–Jing, George Qi Lu, Peter Yang and Jack Ma contend that the evidence introduced by the Government at trial was insufficient to support their respective convictions. We address these claims individually.

The rules for determining appellate sufficiency claims are well settled. First, the defendant bears a "very heavy burden" in challenging the sufficiency of the evidence. *United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986); *United States v. Grubczak*, 793 F.2d 458, 462–63 (2d Cir.1986) (citations

omitted). The test is "whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt." *Grubczak*, 793 F.2d at 463 (citations omitted). In making such a determination, the evidence is viewed in the light most favorable to the government, and all permissible inferences are construed in its favor. *Grubczak*, 793 F.2d at 463; *see United States v. Nersesian*, 824 F.2d 1294, 1324 (2d Cir.), *cert. denied* ── U.S. ──, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be sustained. *United States v. Fiore*, 821 F.2d 127, 128 (2d Cir.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986); *Grubczak*, 793 F.2d at 462–63). Nor is the government required to preclude every reasonable hypothesis which is consistent with innocence. *Fiore*, 821 F.2d at 128.

Defendants Shiang Bao–Jing and George Qi Lu challenge the sufficiency of the evidence with respect to their convictions on count three of the indictment, the only count of which they were convicted, which relates to the heroin-cocaine conspiracy described *supra* in Section IB.

Since "conspiracy by its very nature is a secretive operation," *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980), the elements of a conspiracy may be established through circumstantial evidence. *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983) (quoting *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982)). However, "absent evidence of purposeful behavior, mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy; and mere association with conspirators is similarly insufficient." *United States v. Martino*, 759 F.2d 998, 1002 (2d Cir.1985) (citations omitted); *United States v. Johnson*, 513

F.2d 819, 823–24 (2d Cir.1975). Thus, evidence of purposeful behavior designed to further a conspiracy must be shown to prove membership in that conspiracy. *See United States v. Torres*, 519 F.2d 723, 726 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975); *Johnson*, 513 F.2d at 823.

■ Considering first Shiang Bao–Jing, in addition to his presence at preliminary discussions in April, 1985, recorded conversations in June and July, 1985 indicate that Shiang played an active role in the scheme to distribute heroin and cocaine. For example, Shiang stated that after Chang's arrest, it was Shiang's intention to develop the profitable ventures that Chang had planned for United Bamboo. These included, in addition to gambling, extortion and prostitution, the arrangement of heroin and cocaine transactions. Shiang revealed that such activities were a part of a ten point plan to establish United Bamboo's presence in the United States.

In furtherance of this plan, Shiang arranged for Steven Wong and his undercover colleagues to meet George Qi Lu in Los Angeles on June 19, 1985. Shiang discussed his sources for cocaine and heroin with Wong at that meeting. In addition, over the next several days, Shiang discussed his awareness of his associates' dealings with at least one source regarding possible narcotics transactions. Soon thereafter, Shiang began to deal with the source himself with respect to potential narcotics transactions. On July 15, 1985, Shiang told Steven Wong that samples of heroin and cocaine were available from this source, and five days later brought his connection to Las Vegas in an unsuccessful effort to set up a meeting with Wong and Lam Tso to arrange narcotics transactions.

In summary, there was ample evidence of Shiang Bao–Jing's purposeful activity in furtherance of the conspiracy charged in count three of the indictment.

■ The evidence was also sufficient to sustain defendant George Qi Lu's conviction. Although Lu argues that he cannot be convicted of conspiracy because the evi-

dence established only that he was helping a willing buyer to locate a willing seller, *see United States v. Tyler*, 758 F.2d 66, 68–69 (2d Cir.1985), this contention is belied by Lu's own recorded statements, as well as several recorded statements of his associates, which convincingly demonstrate a considerably broader participation in the heroin-cocaine conspiracy.

For example, on June 19, 1985, after Lu was met at the Los Angeles airport by Shiang and Steven Wong, Lu and Wong discussed narcotics transactions at length en route to a meeting at a Los Angeles restaurant. Specifically, Lu told Wong of his heroin source from the Golden Triangle, whom Lu had brought to New York on two prior occasions to introduce the source to defendant Lam Tso so that heroin sales could be arranged. In exchange for these services, Lu expected a "red envelope," the traditional container for remuneration among United Bamboo members and associates. These statements alone place the instant case in a different posture from cases where a defendant is merely helping a willing buyer to find a willing seller on an isolated occasion, *see Tyler*, 758 F.2d at 69; *United States v. Torres*, 519 F.2d 723, 726 (2d Cir.), *cert. denied*, 423 U.S. 1019, 96 S.Ct. 457, 46 L.Ed.2d 392 (1975), and "more than adequately establish[ ] his status as a conspirator." *Torres*, 519 F.2d at 726.

Moreover, in addition to Lu's own statements, defendant Lam Tso told Steven Wong on May 24, 1985 that George Qi Lu would be meeting a heroin source in Los Angeles and arranging narcotics transactions on behalf of Lam Tso and Steven Wong. Significantly, it was Lam Tso who was originally to meet with the source and arrange transactions the previous day. As the government argues, it would certainly be reasonable for the jury to infer that Lu's substitution for Lam Tso at the meeting indicated that Lu was acting in concert with Lam Tso in the conspiracy. Finally, Lu arranged for defendant Chang An–Lo to meet with Lu's source from the Golden Triangle, thus bringing Lu again within the scope of the conspiracy. In sum, there was sufficient evidence to convict George Qi Lu on count three.

■ Peter Yang contends that there was insufficient evidence to convict him on count ten of the indictment, the conspiracy to import and distribute three hundred kilograms of heroin described *supra* in section ID. This was the only count on which Yang was convicted. His claim is without merit.

The evidence establishes that Yang was a participant in the August 20, 1985 meeting in New York at which he and several members of the United Bamboo discussed, among other things, the three hundred kilogram deal. Yang was introduced to those unfamiliar with him as one of the toughest of the United Bamboo. Yang told Steven Wong during the course of the meeting that the three hundred kilograms of heroin was "worthwhile fighting over."

Immediately after the meeting, while discussing the crackdown in Taiwan on United Bamboo following the murder of Harry Liu, Yang affirmatively acknowledged his association with United Bamboo, stating: "They catch a lot of peoples this time, they really hurt us." Yang also participated in a meeting the next day at which the details of the importation scheme were reviewed.

Yang claims that his presence at these meetings, and any comments made thereat, pertained solely to his desire to be employed at a Las Vegas gambling casino, and thus were not related to the heroin conspiracy. However, Yang's presence and active participation in the meetings, which explicitly concerned the heroin scheme, in conjunction with his comments relating to that subject matter, would certainly allow a rational juror to find Yang guilty of conspiracy.

■ Jack Ma challenges the sufficiency of the evidence underlying his conviction on counts one, seven, eight, ten and twelve of the indictment, relating to the general RICO conspiracy, the narcotics conspiracies described *supra* in sections IC and ID, and illegal interstate transportation and delivery of firearms. His claim cannot be sustained.

Ma was not only present at, and a participant in, the meetings at which these conspiracies and transactions were discussed, but was present at the actual delivery of the one hundred fifty pounds of marijuana and six firearms which are the subject of counts seven, eight, and twelve. The final $25,000 payment for the marijuana was made to Ma. He was also present at the meetings at the Vista Hotel in Manhattan on September 13, 14 and 15 at which the transaction involving three hundred kilograms of heroin, the subject of count 10, was conducted. Finally, he was the personal bodyguard for defendant Chen Chih-Yi, a major leader of United Bamboo in the United States. In short, there was ample evidence to support his several convictions.

### B. Denial of Severance Motion.

Defendants Ah Min and John Kirkpatrick argue that Judge Carter improperly denied their motion for severance in violation of Fed.R.Crim.P. 14, thereby depriving them of a fair trial.[4] Their claim is without merit.

■ Rule 14 of the Federal Rules of Criminal Procedure authorizes a trial judge to grant a severance of defendants if it appears that a defendant will be prejudiced by a joinder of defendants.[5] Motions to sever under Rule 14 are committed to the sound discretion of the trial judge, and a denial of such a motion will be reversed only upon a showing of clear abuse of that discretion. *United States v. Cody*, 722 F.2d 1052, 1061 (2d Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 873 (1984); 1 C. Wright, *Federal Practice & Procedure* § 227, at 854 (2d ed. 1982 & Supp. 1987). In seeking to overturn the denial of a Rule 14 motion,

[t]he burden is upon a moving defendant to show facts demonstrating that he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial. The defendant must demonstrate that he suffered such prejudice as a result of the joinder, not that he might have had a better chance for acquittal at a separate trial.

*United States v. Burke*, 700 F.2d 70, 83 (2d Cir.) (quoting *United States v. Rucker*, 586 F.2d 899, 902 (2d Cir.1978)), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

Ah Min and Kirkpatrick simply do not meet this heavy burden. They argue that the overwhelming majority of the evidence introduced at trial was not admissible against them, but rather was relevant only to the other defendants. This, they assert, resulted in a spillover effect so prejudicial that it denied defendants a fair trial. They contend this was especially so with respect to the evidence of Henry Lui's murder.

We find this argument unpersuasive. First, "the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." *United States v. Carson*, 702 F.2d 351, 367, (2d Cir.) (citations omitted), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2457, 77 L.Ed.2d 1335 (1983); *see United States v. Losada*, 674 F.2d 167, 171 (2d Cir.), *cert. denied*, 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). Second, the evidence with respect to each of the defendants was adequately straightforward that the jury could consider it without any significant spillover effect. *Id.* Finally, Judge Carter carefully instructed the jury to consider the case against each defendant separately, and explained that a person may associate with or even be friendly with a criminal

---

**4.** Fed.R.Crim.P. 14 provides in pertinent part:

If it appears that a defendant ... is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice require.

**5.** Fed.R.Crim.P. 8(b) states that:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

Similarly, Rule 8(a) allows for joinder of two or more offenses in an indictment or information.

without being one himself. *See id.; United States v. Weisman,* 624 F.2d 1118, 1130 (2d Cir.), *cert. denied,* 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 91 (1980).

■ Ah Min and Kirkpatrick advance a related argument, contending that their less important roles in the conspiracies required a separate trial in order to avoid improper inferences being drawn against them. However, it is well established that "differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Carson,* 702 F.2d at 366–67; *see United States v. Aloi,* 511 F.2d 585, 598 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975). We conclude that Judge Carrer did not abuse his discretion in denying severance. *See United States v. Herrera,* 584 F.2d 1137, 1143 (2d Cir.1978).

C. *Admission of Duplicate Copies of Telephone Records as Evidence.*

■ Defendant Tung Kuei–Sen contends that the trial court erroneously admitted into evidence certain telephone logs that showed two telephone calls to defendant Ah Min's telephone number in Bangkok, Thailand from Tung's hotel room in Rio de Janeiro, Brazil on August 13 and 15, 1985. Tung argues that the records were inadmissible because they were duplicates rather than the original hotel records, and were not sufficiently authenticated to be deemed reliable. This claim is without merit.

" 'The admissibility of secondary evidence is within the broad discretion of the trial judge.' " *Ruberto v. Commissioner,* 774 F.2d 61, 64 (2d Cir.1985) (per curiam) (quoting *United States v. Covello,* 410 F.2d 536, 543 (2d Cir.) (citations omitted), *cert. denied,* 396 U.S. 879, 90 S.Ct. 150, 24 L.Ed.2d 136 (1969)). Tung has failed to demonstrate that there was any abuse of that discretion.

The government introduced the duplicate telephone logs pursuant to the business records exception to the rule against hearsay stated in Fed.R.Evid. 803(6). That rule provides in pertinent part that a record, "made at or near the time by ... a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record," is admissible upon "the testimony of the custodian or other qualified witness," absent some indication of untrustworthiness. That is, "someone who is sufficiently familiar with the business practice must testify that [the] records were made as part of that practice." *United States v. Rosenstein,* 474 F.2d 705, 710 (2d Cir.1973).

Moreover, "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Fed.R. Evid. 1003. Thus, Tung has the burden of demonstrating "a genuine issue as to the authenticity of the unintroduced original, or as to the trustworthiness of the duplicate, or as to the fairness of substituting the duplicate for the original." *United States v. Georgalis,* 631 F.2d 1199, 1205 (5th Cir.1980).

Tung raises no genuine issue with respect to any of these concerns. Instead, he simply speculates that there is no assurance that the proffered document is actually a duplicate of the original. The government called Jose Candido Novais Couinko, the deputy manager of the Grand Hotel OK, where Tung stayed in Rio de Janeiro, as a witness to testify as to the records. He identified the logs as those kept in the normal course of business at the hotel. As a deputy manager of the hotel, he was certainly qualified as a witness to testify about the records. While he had not compared the specific page of the duplicate with the original, he did recognize the names and signatures of the telephone operators and the handwriting, room numbers and printed format used on the logs.

In addition, the American Consulate in Rio de Janiero affixed a certification under seal to the duplicate copies of the logs which stated that the duplicates were a "true and faithful copy of the original ... [that] were carefully examined by me and

compared with the original and found to agree therewith word for word and figure for figure." This would appear to dispose of any issue as to the authenticity of the telephone logs. In any event, the defendant has not met his burden by making a showing to the contrary. The trial judge was clearly justified in admitting the duplicate logs as evidence.

### D. Trial Publicity.

Defendant Chen Chi–Yi claims that the trial judge erred in denying his motion for a mistrial based upon (1) a juror's having read a newspaper article about the trial during the jury's deliberations, and (2) the procedures followed by the trial judge in dealing with that situation. Chen contends that Judge Carter's inquiry into the matter was too narrow in scope, and that it was error for him not to provide defense counsel an opportunity from the outset to participate in what turned out to be an *ex parte* colloquy with the jurors involved.

On Monday, September 22, 1986, during the jury's deliberations, Judge Carter received a note from each of two jurors. The first note from juror Geels stated:

> An incident happened on Friday that I feel duty bound to report. One of the jurors announced to all of us that that he had read an article in Thursday's paper regarding this trial and that he wanted to tell the jurors what the article said.... I have been very perturbed about this incident and question whether this juror can be an impartial one in this case.

After reading the note, Judge Carter called juror Geels into his robing room and inquired about the incident. The judge ascertained that Geels interrupted the other juror before he could relate the subject matter of the story to the remaining members of the jury. Immediately after speaking with Ms. Geels, Judge Carter questioned juror West, who conceded in the second note that he was the person who read the newspaper article. West stated unequivocally that reading the article had not affected his judgment of the case in any way. He also confirmed Ms. Geels'

statement that no one else had been told about the contents of the article.

Shortly thereafter, Judge Carter convened all the parties in open court and told them about the incident. He explained his actions with respect to the *ex parte* examinations of the jurors, and asked for further suggestions from counsel. Defense counsel objected to not being apprised of the situation until after Judge Carter had questioned the jurors. In response, Judge Carter offered all counsel the opportunity to interview the jurors. Counsel declined this offer and moved unsuccessfully for a mistrial.

■ The trial court has wide discretion in determining how to pursue an inquiry into the effects of extra-record information upon a jury. *United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir.), *cert. denied,* 461 U.S. 958, 103 S.Ct. 2431, 77 L.Ed.2d 1318 (1983). This circuit has set forth general guidelines that a trial judge should follow in exercising that discretion where the problem of media trial publicity surfaces. *United States v. Gaggi,* 811 F.2d 47, 51 (2d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *see United States v. Lord,* 565 F.2d 831, 838–39 (2d Cir.1977); *United States v. Pfingst,* 477 F.2d 177, 186, (2d Cir.), *cert. denied,* 412 U.S. 941, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973); *United States v. Bentvena,* 319 F.2d 916, 934 (2d Cir.), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *United States v. Agueci,* 310 F.2d 817, 831–32 (2d Cir.1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

The trial judge should first determine whether the coverage has a potential for unfair prejudice. *Gaggi,* 811 F.2d at 51. "If the broadcast or article contains no information beyond the evidence in the case, or if the information is clearly innocuous ..., further inquiry may not be necessary." *Lord,* 565 F.2d at 838; *United States v. Carrodeguas,* 747 F.2d 1390, 1395 (11th Cir.1984), *cert. denied,* 474 U.S. 816, 106 S.Ct. 60, 88 L.Ed.2d 49 (1985). Next, the jury should be canvassed to ascertain if they have learned of the potentially prejud-

ical publicity (an inquiry that would have been superfluous here in view of the jury's bringing the matter to Judge Carter's attention). *Gaggi,* 811 F.2d at 51; *Lord,* 565 F.2d at 838. If it is ascertained that any juror has been exposed to such publicity, he or she "should be examined individually, out of the presence of the other jurors, to determine the extent of the exposure and its effect on the juror's attitude toward the trial." *Lord,* 565 F.2d at 838–39; *Gaggi,* 811 F.2d at 51. Finally, the trial judge can then determine whether any further steps are necessary to ensure a fair trial. *Lord,* 565 F.2d at 839.

■ Judge Carter substantially followed these guidelines. Upon learning about the incident, he called the two affected jurors into his robing room and questioned them individually. He asked juror West about the article and its contents, and its effect upon his judgment. West claimed that the article would not affect his impartiality, and Judge Carter concluded that the article was innocuous after reviewing it. The judge was also satisfied, after speaking with Ms. Geels, that the other jurors had not seen the article and were not influenced in any way by West's observations. Under these circumstances, we cannot say that Judge Carter abused his discretion by allowing the jurors to continue to deliberate, especially given his face-to-face assessment of the jurors' demeanor and credibility. *See Patton v. Yount,* 467 U.S. 1025, 1038 n. 14, 104 S.Ct. 2885, 2892 n. 14, 81 L.Ed.2d 847 (1984). Furthermore, the matter was put before defendants and their counsel, and they were provided with an opportunity to interview the jurors. In sum, Judge Carter acted well within his discretion, and there is no reversible error.

E. *Inconsistent Verdicts.*

■ Defendants Chang An–Lo, Tung Kuei–Sen and Jack Ma challenge their convictions on the grounds that some of the jury verdicts were inconsistent. Lam Tso makes an analogous argument that the jury manifestly failed to follow the court's instructions, in view of the jury verdicts. Specifically, Chang was convicted on count

three, the conspiracy to distribute heroin and cocaine, and was acquitted on the RICO charges in counts one and two. Tung was convicted on count ten, the conspiracy to import and distribute three hundred kilograms of heroin, and was also acquitted on the RICO charges. Ma was convicted on counts seven and ten, relating to narcotics conspiracies, and on count one, the RICO conspiracy count that alleged these narcotics conspiracies as predicate acts, but was acquitted on count two, the substantive RICO count which alleged the same narcotics conspiracies as predicate acts. There is no discernible inconsistency in the verdicts rendered as to Lam Tso.

Chang, Tung and Ma argue that conviction on the various conspiracy counts, which involve conduct identical to that charged as predicate acts of racketeering in the RICO counts, is so logically inconsistent with acquittal on the RICO counts that reversal of the conspiracy convictions is warranted.

In *Dunn v. United States,* 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356 (1932), the Supreme Court held that a defendant will not be allowed to attack a conviction on the ground of inconsistent verdicts. The rule has been recently reaffirmed in *United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). The Supreme Court there explained that inconsistent verdicts may be the product of compromise, mistake or lenity on the part of the jury. *Id.* at 65–66 & n. 7, 105 S.Ct. at 476–477 & n. 7; *see Dunn,* 284 U.S. at 394, 52 S.Ct. at 191. "Inconsistent verdicts therefore present a situation where 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred, but it is unclear whose ox has been gored." *Powell,* 469 U.S. at 65, 105 S.Ct. at 477. The Court noted further that the government cannot attack an inconsistent acquittal, even if palpably erroneous, because of the Constitution's double jeopardy provision. *Id.*

The Court also found that a defendant should not be allowed to challenge inconsistent verdicts on the ground that they resulted not from lenity, but rather from

some error that worked to the defendant's disadvantage. *Id.* at 66, 105 S.Ct. at 477. Such challenges would either be based upon pure speculation or would improperly intrude upon the jury's deliberations. *Id.* Finally, the Court noted that a defendant is protected from jury irrationality or error by independent review of the sufficiency of the evidence by trial and appellate courts. *Id.* at 67, 105 S.Ct. at 477.

These precedents clearly preclude the challenges presented here as to the alleged inconsistency of the verdicts reached by the jury in this case. Even assuming that some of the verdicts are inconsistent, which is less than certain where the allegedly inconsistent acquittals occur on RICO counts implicating the special and distinct requirements of that statute, there is no basis for reversal of the assertedly offensive guilty verdicts.

### F. *Sentencing Matters.*

■ Defendant Tung Kuei–Sen contends that the district court failed, in sentencing Tung, to comply with Fed.R. Crim.P. 32(c)(3)(D), which provides:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

Tung accordingly seeks "remand [ ] for a hearing on the allegations contained in the presentence report and for sentencing."

Defendant George Qi Lu contends that he contested allegations in his presentence report and requested a hearing with respect to them which hearing the district court improperly denied. He requests vacation of his sentence and remand for a hearing.

Our review of the transcript of the sentencing hearing does not indicate any explicit, on-the-record compliance with Rule 32(c)(3)(D) with respect to these defendants in the course of that hearing, and the government does not contend in its brief that there has been such compliance, which is mandatory in this circuit. *United States v. Weichert,* 836 F.2d 769, 771 (2d Cir. 1988); *United States v. Bradley,* 812 F.2d 774, 781–82 (2d Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 107, 98 L.Ed.2d 67 (1987); *United States v. Ursillo,* 786 F.2d 66, 71 (2d Cir.1986). Out of an abundance of caution, we accordingly remand for findings or determinations as to these defendants pursuant to Fed.R.Crim.P. 32(c)(3)(D). If the district court elects to make findings as to any controverted allegations in either of these defendants' presentence reports, it should then determine, in the exercise of its discretion, whether a hearing is required with respect to those matters. *See United States v. Fatico,* 603 F.2d 1053, 1057 n. 9 (2d Cir.1979); *see also United States v. Bradley,* 812 F.2d at 783 n. 10.

### G. *Other Contentions.*

We have considered defendants' other contentions, and find them to be without merit.

### III.  Conclusion

The judgments of conviction are affirmed. The case is remanded for compliance with Fed.R.Crim.P. 32(c)(3)(D) with respect to defendants Tung Kuei–Sen and George Qi Lu.